238 P.3d 470 (2010)
STATE of Washington, Respondent,
v.
Clarence Andrew KINTZ, aka Chuck Kintz, Petitioner.
State of Washington, Respondent,
v.
Clarence Andrew Kintz, aka Chuck Kintz, Petitioner.
Nos. 81688-3, 81689-1.
Supreme Court of Washington, En Banc.
Argued October 27, 2009.
Decided August 26, 2010.
*472 Thomas Matthew Dunn, Law Offices of Michael K. Tasker, Bellingham, WA, for Petitioner.
Eric John Richey, Hilary A. Thomas, Kimberly Anne Thulin, Whatcom County Prosecutor's Office, Philip James Buri, Buri Funston Mumford, P.L.L.C., Bellingham, WA, for Respondent.
ALEXANDER, J.
¶ 1 Clarence Kintz obtained review of a decision of the Court of Appeals affirming his convictions in Whatcom County Superior Court on two charges of stalking. Kintz contends that the Court of Appeals erred by affirming the trial court's interpretation of the term "separate occasions," which appears in the stalking statute, RCW 9A.46.110. He also contends that the Court of Appeals incorrectly determined that sufficient evidence was presented at trial to support his convictions. We affirm the Court of Appeals.

I

The Westfall Incident
¶ 2 On December 21, 2005, Theresa Westfall was walking with her three children and two dogs in Bellingham's Lake Padden Park. As Westfall and her group (hereinafter referred to as Westfall) walked by a white van in a parking lot, the driver said something to Theresa Westfall about "parking." Verbatim Report of Proceedings (VRP) (June 28, 2006) at 215, 227, 231. Westfall then walked down a trail that eventually connected with a road. When Westfall came out to the road, the white van approached them slowly from behind and then drove by and out of sight. At that point, Theresa Westfall became frightened.
¶ 3 The white van reappeared and this time crept slowly past Westfall. The van then turned around and made a third pass by Westfall. A short while later the van again drove slowly by Westfall. The van then pulled into a parking lot, backed up, and drove by Westfall a fifth time. By this time, according to Theresa Westfall, she was "very scared and angry." Id. at 221.
After the van made its fifth pass, it came to a stop at a stop sign. Despite the fact that there was little traffic, the van remained at the stop sign until Westfall crossed the street in front of the van. After Westfall finished crossing the street, the van remained at the stop sign. This caused Theresa Westfall to call 911. The van then drove by Westfall a final time. Westfall did not see the van again.
¶ 5 During the passes and during the time the van was at the stop sign, the driver of the van did not say anything to Westfall. Theresa Westfall testified that she did not look at the person driving the van and, when asked at trial if she could identify Kintz as the driver of the van, she was unable to do so.
¶ 16 Two officers from the Bellingham Police Department responded to Theresa Westfall's 911 call. The officers stopped a white van near Lake Padden approximately 20 minutes after they were dispatched. Kintz, who was driving the van, told the officers that he was lost and was looking for a friend's house. He also stated that he had come to the park after having an argument with his wife.

The Gudaz Incident
¶ 7 On January 28, 2006, Jennifer Gudaz was jogging on the shoulder of a road that abutted Lake Samish, near Bellingham. As Gudaz headed north on the road, she noticed a white van, driving south, go past her. The driver of the van made no contact with Gudaz and, consequently, at that time she was unconcerned.
¶ 8 Later the same van, now driving north, came up next to Gudaz and stopped. The driver of the van asked Gudaz if she could provide directions to an address. After he gave her an address, Gudaz indicated that *473 she could not help him. Gudaz testified that she "was a little bit nervous" at this time and "didn't feel comfortable." Id. at 85,
¶ 9 Gudaz, who had continued running, later saw the van moving down a driveway. Gudaz indicated that she "felt a little more comfortable at that point" because she thought the driver "had found where he was going." Id. at 86-87. However, the van subsequently drove by Gudaz and stopped in front of her. The driver, at this point, again asked Gudaz for directions telling her that he did not know where he wanted to go. He later asked Gudaz how to get to the freeway. The driver also tried to hand Gudaz a clipboard, saying that he wanted her to draw him a map. Gudaz drew the requested map, gave the driver directions, and started jogging again as the van left. Gudaz said that by this time she was "pretty frustrated" and "pretty scared." Id. at 113.
¶ 10 Gudaz later saw the van on the side of the road and ran past it. Shortly thereafter the van pulled up next to her again. It then crossed into the oncoming lane, faced the wrong way, and came within one foot of Gudaz. The driver said, "`Do you need a ride?'" Id. at 91. Gudaz answered, "[N]o." Id. The driver then asked, "`You don't need money?'" Id. Gudaz responded by pointing up the road, saying, "`No. Maybe your road is up there.'" Id. She then started running again. The van continued traveling in the same direction as Gudaz until it left her sight.
¶ 11 Gudaz, frightened by what she had experienced, ran down a road toward Lake Samish and hid between a fence and a shed for approximately 10 to 15 minutes. She said that by this time she was "really scared" and "a mess." Id. at 93. When Gudaz saw two bicyclists picking berries, she came out from her hiding place and ran toward them. The bicyclists accompanied Gudaz to a nearby county park.
¶ 12 On their way to the park, Gudaz and the bicyclists saw the van coming toward them. They observed it travelling slowly as it rounded a corner and then increase speed as it drove quickly past Gudaz and the bicyclists. Gudaz testified that she was "freaked out" after the van drove by. Id. at 95. She had no further contact with the van or its driver. When Gudaz and the bicyclists reached the county park, Gudaz called 911. The entire incident, according to Gudaz, took place in approximately one hour or less.
¶ 13 Gudaz reported the van's license plate number to the Whatcom County Sheriff's Department. The van was registered to Clarence Kintz's wife, Mary Kintz. About a week after the incident, Clarence Kintz told a deputy from the sheriff's department that he initially contacted Gudaz on the morning of January 28 because he was lost and that after driving around the lake, he had asked her for directions. Kintz denied offering Gudaz a ride or money.

Procedural History
¶ 14 Kintz was charged in Whatcom County Superior Court with two counts of misdemeanor stalking under separate informations.[1]See Clerk's Papers (CP) at 103-04; see State v. Kintz, Whatcom County Super. Ct. J. & Sentence Cause No. 06-1-00324-4 (Aug. 9, 2006). One information related to the Westfall incident and the other related to the Gudaz incident.
¶ 15 At the conclusion of the trial, the jury was instructed in part that one element of the charge relating to the Westfall incident was that Kintz "intentionally and repeatedly harassed or repeatedly followed Theresa Westfall" and that one element of the charge arising from the Gudaz incident was that Kintz "intentionally and repeatedly harassed or repeatedly followed Jennifer Gudaz." CP at 46, 47. Although the jury found Kintz guilty of each count "of the crime of stalking as charged," it was not asked to specify whether it found Kintz had stalked Westfall and Gudaz by intentional and repeated harassment or by repeated following.[2] CP at 22.
*474 ¶ 16 Kintz appealed his convictions to Division One of the Court of Appeals. He raised several claims there, including insufficiency of the evidence. State v. Kintz, 144 Wash. App. 515, 521-23, 191 P.3d 62 (2008).[3] The Court of Appeals concluded that "[w]hether the evidence is sufficient turns on the legal meaning of `separate occasion.'" Id. at 521-22, 191 P.3d 62. It affirmed both convictions, holding in part that the trial court did not err (1) "in interpreting the repeated contact provision of the statute" or (2) "in finding that sufficient evidence supported a conclusion that Kintz had contact with the victims on separate occasions as contemplated by the statute." Id. at 523, 191 P.3d 62. The Court of Appeals did not specify whether the separate occasions involving Kintz and his victims were intentional and repeated harassment or repeated following.
¶ 17 Kintz petitioned our court for review of the published portion of the Court of Appeals decision, including "the Court of Appeals['] holding regarding the definition of `separate occasion,' and whether there were sufficient evidence herein to support the element of `repeated' following or harassment." Appellant's Pet. for Discretionary Review at 5.[4] We granted review and consolidated the cases. State v. Kintz, 165 Wash.2d 1011, 1012, 198 P.3d 513 (2008).

II

A
¶ 18 Kintz first asserts that the Court of Appeals erred by affirming the trial court's interpretation of the term "separate occasions," which is contained in RCW 9A.46.110, the stalking statute. "Interpretation of a statute is a question of law that we review de novo." State v. Engel, 166 Wash.2d 572, 576, 210 P.3d 1007 (2009) (citing State v. Wentz, 149 Wash.2d 342, 346, 68 P.3d 282 (2003)).
¶ 19 The stalking statute provides in relevant part:
(1) A person commits the crime of stalking if, without lawful authority and under circumstances not amounting to a felony attempt of another crime:
(a) He or she intentionally and repeatedly harasses or repeatedly follows another person; and
(b) The person being harassed or followed is placed in fear that the stalker intends to injure the person, another person, or property of the person or of another person. The feeling of fear must be one that a reasonable person in the same situation would experience under all the circumstances; and
(c) The stalker either:
(i) Intends to frighten, intimidate, or harass the person; or
(ii) Knows or reasonably should know that the person is afraid, intimidated, or harassed even if the stalker did not intend to place the person in fear or intimidate or harass the person.
RCW 9A.46.110.[5] The term "repeatedly" is defined as meaning "on two or more separate *475 occasions." RCW 9A.46.110(6)(e). The statute does not, however, define "separate occasions." "Follows" is defined as "deliberately maintaining visual or physical proximity to a specific person over a period of time." RCW 9A.46.110(6)(b).[6]
¶ 20 "Harasses," according to RCW 9A.46.110(6)(c), means "unlawful harassment as defined in RCW 10.14.020," which in turn states:
(1) "Unlawful harassment" means a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, harasses, or is detrimental to such person, and which serves no legitimate or lawful purpose. The course of conduct shall be such as would cause a reasonable person to suffer substantial emotional distress, and shall actually cause substantial emotional distress to the petitioner, or, when the course of conduct would cause a reasonable parent to fear for the well-being of their child.
(2) "Course of conduct" means a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose. "Course of conduct" includes, in addition to any other form of communication, contact, or conduct, the sending of an electronic communication. Constitutionally protected activity is not included within the meaning of "course of conduct."
¶ 21 In upholding the trial court's interpretation of "separate occasions," the Court of Appeals concluded that a separate occasion is a "distinct, individual, noncontinuous occurrence or incident." Kintz, 144 Wash.App. at 522, 191 P.3d 62 (relying in part on the definitions of "separate" and "occasion" in Webster's Third New International Dictionary (1969)). In reaching this decision, it observed that "[t]he legislature could have defined `separate occasions' as separate days or dates or as separated by a minimum time period, but it did not do so" and reasoned that "[t]his suggests that the legislature did not intend a stalking charge to hinge on a predefined interval of time between incidents." Id. at 522-23, 191 P.3d 62.
¶ 22 Kintz claims the Court of Appeals erred by interpreting "separate occasions" as it did, arguing that it is an ambiguous term that could mean an event occurring over the course of a day, several hours, or within only a few minutes. Appellant's Pet. for Discretionary Review at 8, 14-15. Accordingly, Kintz asks us to apply the rule of lenity, resolve the ambiguity in his favor, and rule that separate occasions are "event[s] occurring at least over a substantial period of time."[7]Id. at 15, 191 P.3d 62. The State responds that the term is unambiguous. Suppl. Br. of Resp't at 12.
¶ 23 "When interpreting any statute, our primary objective is to `ascertain and give effect to the intent of the Legislature.'" Koenig v. City of Des Moines, 158 Wash.2d 173, 181, 142 P.3d 162 (2006) (quoting Nat'l Elec. Contractors Ass'n v. Riveland, 138 Wash.2d 9, 19, 978 P.2d 481 (1999)). In order to determine legislative intent, we begin with [an examination of] the statute's plain language, according it its ordinary meaning. Id. "[W]e may discern the plain meaning of nontechnical statutory terms from their dictionary definitions." State v. *476 Cooper, 156 Wash.2d 475, 480, 128 P.3d 1234 (2006) (citing State v. McDougal, 120 Wash.2d 334, 350, 841 P.2d 1232 (1992)). If necessary, it is also appropriate to rely on the thesaurus when interpreting statutes. See, e.g., Gen. Tel. Co. v. City of Bothell, 105 Wash.2d 579, 584 n. 5, 716 P.2d 879 (1986); Zobrist v. Culp, 95 Wash.2d 556, 561, 627 P.2d 1308 (1981); Crane Towing, Inc. v. Gorton, 89 Wash.2d 161, 171, 570 P.2d 428 (1977).
¶ 24 If language in a statute is subject to only one interpretation, then our inquiry ends. State v. Armendariz, 160 Wash.2d 106, 110, 156 P.3d 201 (2007) (citing State v. J.P., 149 Wash.2d 444, 450, 69 P.3d 318 (2003)). Language is deemed unambiguous when it is not susceptible to two or more reasonable interpretations. State v. Delgado, 148 Wash.2d 723, 726-27, 63 P.3d 792 (2003) (citing State v. McGee, 122 Wash.2d 783, 787, 864 P.2d 912 (1993)). If a criminal statute is ambiguous, the rule of lenity requires us to construe the statute in favor of the defendant absent legislative intent to the contrary. State v. Jacobs, 154 Wash.2d 596, 601, 115 P.3d 281 (2005) (citing In re Post Sentencing Review of Charles, 135 Wash.2d 239, 249, 955 P.2d 798 (1998); State v. Roberts, 117 Wash.2d 576, 585, 817 P.2d 855 (1991)).
¶ 25 Here, as the Court of Appeals noted, "Webster's Third New International Dictionary 1560, 2069 (1969) defines `occasion' as `a particular occurrence: HAPPENING, INCIDENT'; `separate' is defined as `set or kept apart,' `not shared with another: INDIVIDUAL, SINGLE,' autonomous, independent, distinct, and different." Kintz, 144 Wash. App. at 522, 191 P.3d 62. Similarly, our court has held that the undefined term "separate" in a different statute meant "`not shared with another,' `individual,' `single,' `existing by itself,' `independent,' `distinct,' and `different.'" State v. Bolar, 129 Wash.2d 361, 366, 917 P.2d 125 (1996) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2069 (1986)). Given these plain meanings, we conclude that the term "separate occasions" in the stalking statute is unambiguous, agreeing with the Court of Appeals that the only reasonable interpretation of the term is "a distinct, individual, noncontinuous occurrence or incident." Kintz, 144 Wash.App. at 522, 191 P.3d 62.
¶ 26 In reaching this decision, it is our view that the interpretation of separate occasions that Kintz asks us to adopt is not reasonable and, therefore, does not demonstrate an ambiguity. His interpretation of the meaning of the term is not supported by the above-discussed plain language of the stalking statute and plain meaning of "separate" or "occasion." Nor is it consistent with the legislative history of the stalking statute, which demonstrates a consistent broadening, rather than limiting, of the applicability of the statute. See Laws of 2006, ch. 95, § 3 (expanding stalking to include acts committed against certain employees of the Department of Social and Health Services); LAWS of 1999, ch. 27, § 1 (expanding scope of statute by clarifying that electronic communications are included in the types of conduct that may constitute stalking or harassment); Laws of 1994, ch. 271, § 801 (broadening the scope of proscribed behavior by adding "harass[ing]" to the type of conduct that constitutes stalking and replacing the requirement that a stalker repeatedly follow a person while "in transit from one location to another" with the condition that the stalker repeatedly deliberately maintain visual or physical proximity over a period of time in a manner the stalker would reasonably know would instill fear of injury to the victim's person or property).
¶ 27 In addition, the interpretation suggested by Kintz is unsupported by Washington case law interpreting and applying the stalking statute broadly. See, e.g., State v. Becklin, 163 Wash.2d 519, 182 P.3d 944 (2008) (upholding defendant's stalking conviction based on stalking by third party at defendant's direction); State v. Lee, 135 Wash.2d 369, 394, 957 P.2d 741 (1998) (holding sufficient evidence supported stalking convictions of both defendants); State v. Askham, 120 Wash.App. 872, 880-81, 86 P.3d 1224 (2004) (upholding convictions, including felony stalking, where defendant's only actual contact with victim was sending repeated e-mails); State v. Ainslie, 103 Wash.App. 1, 6-7, 11 P.3d 318 (2000) (upholding stalking conviction despite defendant never having actual physical or verbal contact with victim).
*477 ¶ 28 Moreover, the definition Kintz sets forth violates the rule of statutory interpretation prohibiting courts from adding words or clauses to an unambiguous statute when the legislature has chosen not to include that language. Delgado, 148 Wash.2d at 727, 63 P.3d 792 (two-strike statute not subject to construction beyond unambiguous plain language); see also, e.g., State v. Thompson, 151 Wash.2d 793, 800-01, 92 P.3d 228 (2004) (court prohibited from reading "civil actions" into plain language of "knock and wait" statute). As the State correctly argues and the Court of Appeals properly reasoned, the legislature could have required separate occasions to occur over a "substantial period of time" but chose not to do so. See Suppl. Br. of Resp't at 13; Kintz, 144 Wash.App. at 522-23, 191 P.3d 62. Consequently, we cannot add that limiting language. Furthermore, even if we felt that the omission of a "substantial period of time" limitation was a legislative error, "`[t]his court has exhibited a long history of restraint in compensating for legislative omissions.'" Delgado, 148 Wash.2d at 730, 63 P.3d 792 (quoting State v. Taylor, 97 Wash.2d 724, 728, 649 P.2d 633 (1982)).
¶ 29 Kintz also contends that the definition of "separate occasions" applied by the Court of Appeals was erroneous because it incorporates "the term `non-continuous.'" Appellant's Pet. for Discretionary Review at 16. We disagree because "noncontinuous" is synonymous with "discontinuous," which in turn is a synonym for "separate." ROGET'S INTERNATIONAL THESAURUS § 801.20, at 561, § 812.4, at 568 (5th ed.1992). "Discontinuous" is also synonymous with "distinct" and "independent," two terms that our court has held mean "separate." Id.; Bolar, 129 Wash.2d at 367, 917 P.2d 125. Thus, it was not error for the Court of Appeals to use "noncontinuous" in defining "separate occasions" for purposes of the stalking statute.
¶ 30 The plain meaning of "separate occasions" is clear and subject to only one reasonable interpretation. Consequently, the rule of lenity does not apply. In sum, we agree with the Court of Appeals' interpretation of the term "separate occasions."

B
¶ 31 Kintz argues that, even if the Court of Appeals' interpretation of the term "separate occasions" is correct, there was insufficient evidence to support his convictions. Thus, he contends the Court of Appeals erred by concluding otherwise. The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. Engel, 166 Wash.2d at 576, 210 P.3d 1007 (citing Wentz, 149 Wash.2d at 347, 68 P.3d 282). "When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992) (citing State v. Partin, 88 Wash.2d 899, 906-07, 567 P.2d 1136 (1977)). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." Id. (citing State v. Theroff, 25 Wash.App. 590, 593, 608 P.2d 1254, aff'd, 95 Wash.2d 385, 622 P.2d 1240 (1980)). "Circumstantial evidence and direct evidence are equally reliable" in determining the sufficiency of the evidence. State v. Thomas, 150 Wash.2d 821, 874, 83 P.3d 970 (2004) (citing State v. Delmarter, 94 Wash.2d 634, 638, 618 P.2d 99 (1980)), aff'd, 166 Wash.2d 380, 208 P.3d 1107 (2009).
¶ 32 RCW 9A.46.110(1)(a) provides alternative means of committing the crime of stalking: intentionally and repeatedly harassing or repeatedly following another person. As we have observed, "repeatedly" is defined as "on two or more separate occasions," meaning distinct, individual, noncontinuous occurrences or incidents. RCW 9A.46.110(6)(e). Thus, a stalking conviction requires evidence of two or more distinct, individual, noncontinuous occurrences of following or harassment, and no minimum amount of time must elapse between the occurrences, provided they are somehow separable.
¶ 33 A general verdict of guilty on a single count charging the commission of a *478 crime by alternative means will be upheld only if sufficient evidence supports each alternative means. State v. Ortega-Martinez, 124 Wash.2d 702, 708, 881 P.2d 231 (1994). In this case, the jury was instructed that it must find that Kintz "intentionally and repeatedly harassed or repeatedly followed Theresa Westfall" to convict him of stalking Westfall, and similarly that it must find that Kintz "intentionally and repeatedly harassed or repeatedly followed Jennifer Gudaz" to convict him of stalking Gudaz. CP at 46, 47. The trial court treated the jury's entry of "Guilty Guilty" in both blank spaces on the verdict form as a finding of guilt on each charge. Id. at 16. Because the jury did not express unanimity as to the means by which Kintz stalked his victims, we have examined the record to determine if sufficient evidence supports each alternative means.
¶ 34 Kintz advances two arguments in support of his claim that there was insufficient evidence to support his convictions. First, he asserts that the Westfall incident and the Gudaz incident are each "only one ongoing `following' briefly interrupted by a short break in visual proximity," and thus the State cannot show that Kintz stalked his victims "repeatedly." Pet'r's Suppl. Br. at 12. The State responds that both incidents satisfy the requirement of two or more separate occasions because each involved "repeated contacts, separated by time and physical space." Suppl. Br. of Resp't at 19.
¶ 35 Kintz argues alternatively that "to establish sufficient evidence of repeated following under subsection (1)(a), there must be sufficient evidence that [he] on at least four separate occasions deliberately appeared at the subject locations to maintain visual or physical proximity with each of the respective victims." Pet'r's Suppl. Br. at 12. He arrives at the number four by layering RCW 9A.46.110(1)(a)'s requirement that a person follow another "repeatedly," defined by subsection (6)(e) as "on two or more separate occasions," on subsection (6)(b), which provides that "[a] finding that the alleged stalker repeatedly and deliberately appears at ... any ... location to maintain visual or physical proximity to the person is sufficient to find that the alleged stalker follows the person." RCW 9A.46.110 (emphasis added). According to Kintz, the two or more occasions of following necessary to commit stalking must be multiplied by the "repeatedly," again defined as two or more, in the definition of "follows." We reject this contention.[8]
¶ 36 Kintz misreads the statute. Subsection (6)(b) defines "follows" as simply "maintaining visual or physical proximity to a specific person over a period of time." Thus, a person may follow by doing this only once. The next sentence"A finding that the alleged stalker repeatedly and deliberately appears... is sufficient to find that the alleged stalker follows...."is not part of the definition, only an illustration. Appearing "repeatedly" is "sufficient" to satisfy the definition of "follows"; it is not necessary. Of course, a person must follow "repeatedly," meaning on two or more separate occasions, to satisfy the stalking statute. Thus, contrary to Kintz's assertion, the crime of stalking by "repeatedly follow[ing]" requires sufficient evidence that the person "maintain[ed] visual or physical proximity to a specific person over a period of time" on two separate occasions, not four.
¶ 37 The Court of Appeals in a recent case, State v. Haines, 151 Wash.App. 428, 213 P.3d 602 (2009), review denied, 167 Wash.2d 1022, 225 P.3d 1011 (2010), rejected an argument similar to the one Kintz now presents. That case dealt with the "harasses" prong of the stalking statute instead of the "follows" prong. The defendant, Haines, argued that the stalking statute requires proof of six predicate acts of harassment. Id. at 430, 213 P.3d 602. He arrived at the number six by layering RCW 9A.46.110(1)(a)'s requirement that a person "repeatedly" harass his victim, *479 meaning two or more times, on subsection (6)(c)'s definition of "harasses." Subsection (6)(c) provides that "`[h]arasses' means unlawful harassment as defined in RCW 10.14.020." RCW 10.14.020(2) in turn requires a "course of conduct," meaning "a pattern of conduct composed of a series of acts over a period of time, however short." Pointing to the dictionary definition of "series" as "`a group of usu[ally] three or more things,'" Haines contended that the stalking statute required proof of least six separate acts of harassment to convict a person of stalking: two for "`repeatedly'" in RCW 9A.46.110(1)(a), and three for the "`series'" that comprises a "`course of conduct'" under RCW 10.14.020(2). Haines, 151 Wash.App. at 435, 213 P.3d 602 (quoting Webster's Third New International Dictionary 2073 (1993)).
¶ 38 The Court of Appeals rejected this reasoning, observing that nothing in the statute suggests that each of the individual acts that together comprise harassment, as defined by RCW 10.14.020, must, by itself, constitute harassment:
To the contrary, both the plain text and structure of the statutory sections at issue indicate that what must be "repeated" is a "course of conduct" that "seriously alarms, annoys, harasses, or is detrimental" to the victim. There is no basis whatsoever to suppose that each of the separate acts that comprise that course of conduct must be vexatious when taken in isolation. It is the combination of separate actsnone of which is necessarily criminal in its own rightthat must be "seriously alarm[ing], annoy[ing], harass[ing], or detrimental" to the victim in order for the perpetrator to have committed the criminal offense of stalking.
Id. at 435, 213 P.3d 602 (alterations in original). We agree with the Court of Appeals' reasoning in Haines and conclude, as did that court, that stalking requires two separate acts of harassment or two separate acts of following.[9] It remains to test the Westfall and Gudaz incidents against this requirement to see whether sufficient evidence supports each alternative means. We address each incident in turn.

Westfall Incident[10]
¶ 39 The Westfall incident consisted of four distinct episodes, each separated by a significant interruption of Kintz's contact with Westfall. The first episode consists of Kintz's initial attempt to make contact with Westfall in the parking lot. It ended when Westfall walked down the trail. The second episode consists of Kintz's first pass and ended when Kintz drove out of Westfall's view. At this point, Westfall testified that she became frightened. The third episode encompasses Kintz's second pass, three-point turn, and third pass, at which point Kintz again drove away, leaving Westfall "very scared and angry." VRP (June 28, 2006) at 221. The fourth episode includes Kintz's fourth pass (second three-point turn), and fifth pass (the encounter at the stop sign), and finally a sixth pass. During each episode, Kintz "deliberately maintain[ed] visual and physical proximity" to Westfall. Thus, each episode constitutes a separate occasion of following under RCW 9A.46.110(6)(b). Viewed in the light most favorable to the State, a rational trier of fact could easily have found Kintz guilty of stalking Westfall *480 by following her on two or more separate occasions.[11]
¶ 40 Episodes two, three, and four also constitute separate occasions of unlawful harassment as defined by RCW 10.14.020. Each represents a "course of conduct" directed at Westfall, which seriously alarmed her, served no lawful purpose, was such as would cause a reasonable person to suffer substantial emotional distress, and actually caused substantial emotional distress, as evidenced by Westfall's very real fear. Each would also cause a reasonable parent to fear for the well-being of her children; especially episode four, when Westfall crossed in front of Kintz's idling van with her three children. Based on the breaks in contact between these episodes, the jury could have found that they constituted two or more separate occasions of harassment. Thus, the Court of Appeals properly concluded that sufficient evidence supported Kintz's conviction on the charge of stalking Westfall.

Gudaz Incident
¶ 41 The Gudaz incident was similarly divided into four discrete episodes (leaving aside the first time Gudaz saw the white van, when Kintz drove past her as she was jogging on the shoulder). These four episodes are again separated by a break in Kintz's contact with his target; this time, Gudaz. The first episode consists of Kintz's first stop next to Gudaz and his request for directions. It ended at the point Kintz drove away. The second episode includes Kintz's appearance in a driveway near Gudaz; his subsequent pass; his second stop and second request for directions; and his insistence that Gudaz draw him a map on the clipboard that he thrust out the window. It ended when Kintz again drove away, out of Gudaz's sight, leaving her "pretty frustrated" and "pretty scared." VRP (June 28, 2006) at 113. The third episode encompasses Kintz's presence on the side of the road along which Gudaz was jogging; his third stop, when he pulled up next to Gudaz in the oncoming lane and parked within one foot her; his offer of a ride and money; and his continued travel in Gudaz's direction after she started running again. This episode ended when Kintz finally drove away. At this point, Gudaz, who was "really scared" and a "mess," hid between a shed and a fence until she saw two bicyclists picking berries. Id. at 93. The fourth episode consists of Kintz's past, which left Gudaz "freaked out." Id. at 95
¶ 42 In our view, each of these episodes satisfies the statutory definition of following: "deliberately maintaining visual or physical proximity to a specific person over a period of time." RCW 9A.46.110(6)(b). Each episode, moreover, was bounded by a break in contact between Kintz and Gudaz. Thus, the jury could reasonably find that together they make up two or more separate occasions of following. The jury could also find that they constitute two or more separate occasions of harassment. Episodes two, three, and four in particular represent courses of conduct directed at a specific person, Gudaz, which seriously alarmed her, served no lawful purpose, are such as would cause a reasonable person to suffer substantial emotional distress, and actually caused substantial emotional distress. Accordingly, we affirm the Court of Appeals' conclusion that sufficient evidence supported Kintz's conviction on the charge of stalking Gudaz.

C
¶ 43 Before concluding, we address some of the arguments made by the dissent. The dissent attempts to show that the stalking *481 statute is susceptible to two reasonable interpretations by claiming that "separate occasion[]" in RCW 9A.46.110(6)(e) "very likely describes an interrelated series of events that comprises a single episode," and that this could just as well describe the "totality" of Kintz's interactions with Westfall or Gudaz as it could the "microevents in the larger scheme of the same incident." Dissent at 483. The problem with this argument is that what the dissent refers to as the "microevents" that make up the two counts of stalking in this case, i.e., the episodes delineated in part B, are only "interrelated" to the extent that they involve the same victim, the same intent, and similar conduct; specifically, following and harassment. Of course, they must be interrelated in these ways, by definition, if they are to satisfy RCW 9A.46.110. The statute in question describes a crime made up of constituent partstwo or more occasionsthat are "separate" in one sense but necessarily related in others. The so-called "microevents" in this case are "`[s]eparate,'" meaning "`kept apart,' ... `detached,' `isolated,'" dissent at 483 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2069 (2002)), in one crucial respect: they are divided one from the other by periods of time in which Kintz was out of contact with his victims; periods that the dissent is very reluctant to acknowledge. Only by overlooking these can it be said that Kintz's interactions "were not set or kept apart." Id. at 484. If these separate events can be said to comprise a single episode, it is because they comprise a single episode of stalking.
¶ 44 The dissent also says that the legislature has left courts "rudderless" by not defining "separate occasions" in RCW 9A.46.110(6)(e). Id. at 483. Clearly, the "rudder" the dissent has in mind is some measurement of time that must transpire between the first and second occasions of following or harassment.[12] Thus, the dissent accuses us of "artificially deconstructing the events in [a] single pattern to create multiple patterns," and elsewhere of "cleav[ing] a single course of conduct into multiple courses of conduct." Id. at 484. No artifice was necessary because the breaks in contact appear in the record. The dissent is simply unsatisfied with the length of those breaks and persists in its view that the totality of Kintz's contacts with Westfall or Gudaz constituted but a single occasion. The jury saw things differently. The dissent suggests that any breaks in contact here were too short as a matter of law, but never tells us where the line should be drawn; a line, we emphasize, that the legislature never drew. Our reading of RCW 9A.46.110 simply leaves it to a jury to determine whether such instances of following and harassment, divided by such breaks, were "separate" within the meaning of the stalking statute.
¶ 45 The dissent asserts that what it regards as our "drastic broadening" of the definition of "follows" has "imprudent policy ramifications" because it criminalizes situations in which breaks in contact have resulted in less contact between a stalker and his victims than there would have been had the stalker "hovered closely" around them without interruption. Id. at 487. In that case, there would be only one occasion of following, and "[h]e would not be guilty of stalking. But because Kintz briefly lost visual contact and had to regain immediate proximity to the womenin effect having less contact with the individuals over the course of conductunder the majority's reasoning he is guilty of stalking." Id. The dissent's claim that "[t]his makes no sense" assumes that uninterrupted following is more criminal than following that is broken off and later resumed, i.e., repeated; but it is repetition, not duration, that the legislature has made the sine qua non of *482 stalking: "A person commits the crime of stalking if ... [h]e ... intentionally and repeatedly harasses or repeatedly follows another person; ..." RCW 9A.46.110(1)(a) (emphasis added).
¶ 46 This is perfectly sensible because the repetition of contacts alerts the victim (and the trier of fact) to the stalker's criminal intent, i.e., that he is purposefully targeting the victim, as opposed to coming into contact with her by chance. Indeed, the record here reflects that Kintz's repeated contacts engendered progressively greater fear on the part of Westfall and Gudaz because, with each encounter, it became more apparent that the contacts were not accidental and innocent, but intentional and malevolent. Westfall became frightened when Kintz first followed her family in his van after trying to get her attention in the parking lot, but became "very scared and angry" when he repeated that conduct. VRP (June 28, 2006) at 221. Similarly, Gudaz was unconcerned the first time Kintz drove past her, but became "a little bit nervous" when he returned to ask for directions. She felt "pretty scared" when he came back again to have her draw him a map, grew "really scared" when it became clear that it was she and not directions to the freeway that he was after"need a ride?"and ultimately felt "freaked out." Id. at 85, 113, 93, 91, 95.
¶ 47 Finally, in the service of its argument that no rational jury could have found the elements of stalking beyond a reasonable doubt, the dissent downplays the threatening nature of the contacts in this case. The dissent says that Kintz's conduct simply "fell outside the norm." Dissent at 487. We disagree. Kintz's conduct was not just abnormal, it was threatening. Indeed, Westfall was frightened enough to look for a rock or brick with which to defend her family, and Gudaz at one point considered jumping in the lake to get away from Kintz. The dissent, nevertheless, equates Kintz's behavior to "an ill-considered pickup line" or getting into an argument with a customer in a coffee shop. Id. at 485. The dissent says that we are criminalizing "commonplace interactions" with the result that "many Washingtonians" will find themselves "guilty of stalking in their everyday lives." Id. at 485. The dissent's minimization of the threatening nature of Kintz's behavior is belied by the defense's own expert witness, a clinical psychologist, who answered "yes" when asked if "women reasonably fear harm or injury when stalked in the manner described in these police reports." VRP (July 3, 2006) at 405.

III
¶ 48 In conclusion, we affirm the Court of Appeals' decision upholding the trial court's interpretation of separate occasions in the stalking statute and its conclusion that sufficient evidence supported Kintz's convictions.
WE CONCUR: BARBARA A. MADSEN, Chief Justice, CHARLES W. JOHNSON, SUSAN OWENS, MARY E. FAIRHURST, JAMES M. JOHNSON and DEBRA L. STEPHENS, Justices.
SANDERS, J. (dissenting).
¶ 49 By erroneously interpreting the definition of "separate occasions" in RCW 9A.46.110, the majority today affirms the conviction of a man the legislature never intended to punish. The majority's misconception effectively rewrites Washington's stalking statute. I dissent.

I. Statutory Interpretation
¶ 50 We review statutory interpretation de novo. State v. Engel, 166 Wash.2d 572, 576, 210 P.3d 1007 (2009). Our "fundamental objective in construing a statute is to ascertain and carry out the legislature's intent." Arborwood Idaho, L.L.C. v. City of Kennewick, 151 Wash.2d 359, 367, 89 P.3d 217 (2004). When interpreting a statute we first look to its plain language. State v. Armendariz, 160 Wash.2d 106, 110, 156 P.3d 201 (2007). If the plain language is subject to only one interpretation, our inquiry is at an end. Id. "The statute is to be enforced in accordance with its plain meaning." Id. If the statute remains subject to multiple interpretations after analyzing the plain language, it is ambiguous. Id. "A statute is ambiguous only if susceptible to two or more reasonable interpretations, but a statute is not ambiguous merely because different interpretations are *483 conceivable." Burton v. Lehman, 153 Wash.2d 416, 423, 103 P.3d 1230 (2005). When a criminal statute is ambiguous, the rule of lenity requires us to construe the statute in favor of the defendant, absent legislative intent to the contrary. State v. Jacobs, 154 Wash.2d 596, 601, 115 P.3d 281 (2005).
¶ 51 The majority accurately summarizes the statutes at bar but detours from their constraint. Stalking can occur either by harassment or by following. See RCW 9A.46.110(1)(a). Stalking by harassment requires a(1) repeated[1] (2) course of conduct amounting to unlawful harassment,[2] among other factors not at issue here. Stalking by following requires (1) repeatedly[3] and (2) "deliberately maintaining visual or physical proximity to a specific person over a period of time,"[4] among other factors. "Repeatedly" means "on two or more separate occasions." RCW 9A.46.110(6)(e).
¶ 52 The legislature failed to define "separate occasions" in RCW 9A.46.110(6)(e), leaving courts rudderless to derive its meaning.[5] The majority attempts to rectify this lack of direction by referencing the dictionary[6] and inapposite cases,[7] but these comparisons leave us with more questions than answers.
¶ 53 The problem lies in applying the term "separate occasions" to the facts. "Separate" means "set or kept apart," "standing alone," "detached," "isolated," "existing by itself," and so forth. Webster's Third New International Dictionary 2069 (2002). "Occasion" means "a particular occurrence," "happening," or "incident." Id. at 1560.
¶ 54 Little in these dictionary definitions helps us determine the legislature's intent. The definitions, which essentially provide synonyms to the statutory language, do not adequately guide us in applying the law to the facts. A "separate occasion" very likely describes an interrelated series of events that comprises a single episode. The totality of Clarence Kintz's interactions with either Theresa Westfall or Jennifer Gudaz could be accurately described as a detached or isolated happening or incident. However, while I do not think it is the correct approach, a "separate occasion" could also reasonably describe (as the majority believes) a series of microevents in the larger scheme of the same incident. The legislature may have intended that we regard each event in the series of events as an isolated occasion.
¶ 55 Because the language of the statute is not clear, we cannot know which answer is correct. For purposes of lenity, however, the correct answer does not matter. It is the ambiguity that concerns us. The stalking statute, RCW 9A.46.110, is subject to at least two reasonable interpretations. Because the rule of lenity requires that we find for Kintz, I would reverse and dismiss the charges. See Jacobs, 154 Wash.2d at 601, 115 P.3d 281.
¶ 56 In my view, even if we assume the stalking statute is unambiguous, its plain language would compel the exact opposite result of that reached by the majority. I cannot agree with the majority's application of these terms to the facts. Kintz's interactions with Westfall were not separate. The same is true for Kintz's interactions with Gudaz. His series of acts, instead, are best described as *484 shared, related, connected, and similar. They were not set or kept apart. Both Westfall and Gudaz felt frightened due to the totality of their interaction with Kintz, not due to each act in isolation. If the statute were not ambiguous, the term "separate occasions" would suggest Kintz's series of acts formed a single occasion.
¶ 57 The majority expressly identifies each of Kintz's encounters as an "incident" (e.g., "The Westfall Incident," majority at 472 and 479, and "The Gudaz Incident," id. at 472 and 480). This characterization of each encounter as a singlenot repeatedevent undermines the majority's argument and highlights the folly of fragmenting Kintz's course of conduct to manufacture separate occasions. The dictionary considers the term "incident" to be synonymous with the term "occasion." Webster's, supra, at 1560. By its own terms, then, the majority acknowledges that each incident formed a singlenot repeatedoccasion. Stalking by repeated harassment or repeated following requires separate, i.e., repeated, occasions or incidents.
¶ 58 If the stalking statute were not ambiguous, its plain language would insist Kintz did not harass or follow either individual on separate occasions. The facts suggest he did so only once.

II. Insufficient Evidence
¶ 59 To determine sufficiency of the evidence we must determine, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Engel, 166 Wash.2d at 576, 210 P.3d 1007. "[I]f the evidence is insufficient to present a jury question as to whether the defendant committed the crime by any one of the means submitted to the jury, the conviction will not be affirmed." State v. Ortega-Martinez, 124 Wash.2d 702, 707-708, 881 P.2d 231 (1994) (citing State v. Green, 94 Wash.2d 216, 616 P.2d 628 (1980)). Here, the jury did not indicate the meansharassment or followingby which it found Kintz guilty of stalking. Accordingly if insufficient evidence exists to convict under either means, we must overturn Kintz's conviction.

a. Stalking by Harassment
¶ 60 Stalking by harassment requires that the defendant "repeatedly harasses" another person without lawful authority, among other factors. RCW 9A.46.110(1)(a). As explained above, "repeatedly" means "on two or more separate occasions." 9A.46.110(6)(e). "Harasses" means "unlawful harassment," pursuant to RCW 10.14.020. See RCW 9A.46.110(6)(c). "Unlawful harassment" is a "knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, harasses, or is detrimental to such person, and which serves no legitimate or lawful purpose." RCW 10.14.020(1). "Course of conduct" means "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose." RCW 10.14.020(2).
¶ 61 To be found guilty of stalking under the harassment prong, then, the course of conduct (i.e., the pattern of conduct composed of a series of acts) must occur repeatedly (i.e., happen more than once). Said another way: The defendant must commit a series of acts more than once to stalk a victim by harassment. In both the Westfall and Gudaz incidents, Kintz engaged in only one course of conduct. By definition his actions comprised a single pattern or single series of acts.
¶ 62 But the majority today rewrites the stalking statute to effectively delete the "repeatedly" requirement in RCW 9A.46.110(1)(a), allowing the State to prosecute for stalking when it is not warranted. The majority achieves this end by artificially deconstructing the events in this single pattern to create multiple patterns. It cleaves a single course of conduct into multiple courses of conduct to satisfy the "repeatedly" element of RCW 9A.46.110(1)(a). This sleight of hand impermissibly toys with the stalking statute's plain language. It manipulates facts to force them into the stalking statute when, in reality, they do not fit.
¶ 63 The majority cites a Court of Appeals case, State v. Haines, 151 Wash.App. 428, 213 P.3d 602 (2009), review denied, 167 *485 Wash.2d 1022, 225 P.3d 1011 (2010), for the proposition that harassment requires two separate acts to qualify as stalking. Majority at 478-79. Its reliance on this case is perplexing. Haines unequivocally supports the notion that "any single incident of harassment must comprise a harassing `course of conduct' as defined by RCW 10.14.020(2)i.e., a `series of acts over a period of time, however short.'" Haines, 151 Wash.App. at 435, 213 P.3d 602 (quoting RCW 10.14.020(2)). "[B]oth the plain text and structure of the statutory sections at issue indicate that what must be `repeated' is a `course of conduct'...." Id. "The plain meaning of the words at issue is, again, that it is the series of acts that, when combined, serve to sufficiently alarm, annoy, or cause detriment such that the definition of `harassment' is met." Id. at 436, 213 P.3d 602.
¶ 64 As Haines points out, a series of acts creates a single act of harassmentnot a single act of stalking. The Haines court affirmed Haines's conviction because his harassing conduct (e.g., a series of acts including threats to rape and kill a female store clerk) occurred on clearly separate occasions. Id. at 437, 213 P.3d 602. The first occasion included a single course of conduct (or a "series of acts") when Haines repeatedly told the clerk he intended to (1) rape her, (2) Haines left the shop, (3) the clerk followed him outside to ensure he didn't hurt other customers, and finally (4) Haines threatened to rape and kill her again. Id. at 430-31, 213 P.3d 602. This was the first case of unlawful harassment. The second (or "repeated") incident of harassment occurred more than a month later, when Haines again performed a series of harassing acts. Id. at 431-32, 213 P.3d 602.[8] This repeated harassment (or repeated course of conduct) rightfully constituted stalking.
¶ 65 The majority today would transform both Haines's first and second acts into stalking, when in reality each is unlawful harassment. Haines was guilty of stalking because he harassed his victim initially, then a second time more than a month later. Unlike Haines, Kintz's case involves only a single series of acts (i.e., only one course of conduct) with each individual. Kintz cannot be guilty of stalking by harassment because he did not harass either Westfall or Gudaz repeatedly.
¶ 66 The majority today impermissibly expands stalking incidents by criminalizing commonplace interactions. I read the majority opinion to criminalize, like Kintz, (1) a driver asking a stranger for directions, then (2) turning around (beyond eyeshot) and driving slowly past that same stranger. Majority at 479-80. It categorizes these two events as separate courses of conduct, each worthy of unlawful harassment. Any two interactions separated by "breaks in contact between [the] episodes" could qualify as stalking. Id. at 480. If this is right, many Washingtonians would be guilty of stalking in their everyday lives. A person who enters into a heated verbal exchange with a customer at a coffee shop, breaks off the exchange, but then restarts the debate minutes later on the sidewalk could be guilty of stalking. Similarly, a man who uses an ill-considered pickup line, is rebuffed, but again attempts to woo the object of his affection later, could be convicted of stalking.[9] This cannot be right.
¶ 67 Based on the facts of this case, no rational trier of fact could have found the essential elements of stalking by harassment beyond a reasonable doubt. Insufficient evidence *486 exists to uphold Kintz's conviction. Because the jury did not indicate the alternative means by which it found Kintz guilty, and because the evidence is insufficient to support a conviction for stalking by harassment, Kintz's conviction cannot be sustained. See Ortega-Martinez, 124 Wash.2d at 708, 881 P.2d 231. I would reverse and dismiss the charges.

b. Stalking by Following
¶ 68 Notwithstanding the need to reverse because insufficient evidence exists to support stalking by harassment, I would also reverse because insufficient evidence exists to convict on the alternative means of stalking by following.
¶ 69 Stalking by following requires a repeated following, among other factors. RCW 9A.46.110(1)(a). "Follows" is defined as
deliberately maintaining visual or physical proximity to a specific person over a period of time. A finding that the alleged stalker repeatedly and deliberately appears at the person's home, school, place of employment, business, or any other location to maintain visual or physical proximity to the person is sufficient to find that the alleged stalker follows the person. It is not necessary to establish that the alleged stalker follows the person while in transit from one location to another.
RCW 9A.46.110(6)(b). Following, then, does not explicitly require a course of conduct similar to stalking by harassment, but it does implicitly require something similar. Logically, one cannot follow another without committing a series of acts.[10] Maintaining visual or physical proximity requires multiple actions on the part of the would-be stalker. This series of acts equates to a single episode of following. That single episode of following, in turn, must be repeated on at least two occasions. RCW 9A.46.110(1)(a).[11]
¶ 70 In both the Westfall and Gudaz incidents, Kintz's acts amount to a single episode of following. RCW 9A.46.110(6)(b) describes a series of acts that would constitute a single episode of "follow[ing]."[12] Kintz "repeatedly and deliberately appeared at ... any other location to maintain visual or physical proximity to the person." RCW 9A.46.110(6)(b). These actions are "sufficient to find that the alleged stalker follows the person." Id. (emphasis added). The statute does not say the actions are sufficient to find the alleged stalker "repeatedly follows" the person. The statute articulates a single incident of following. Accordingly Kintz followed Westfall and Gudaz once because, over a period of time, Kintz endeavored to maintain his physical proximity to the women by repeatedly and deliberately appearing where he thought they would be. But he did not follow the women repeatedly, as required by RCW 9A.46.110(1)(a).
¶ 71 The majority, instead, slices the Westfall incident into "four distinct episodes." Majority at 479.[13] It asserts that "each episode constitutes a separate occasion of following under RCW 9A.46.110(6)(b)" because Kintz "`deliberately maintain[ed] visual and physical proximity.'" Id. (quoting RCW 9A.46.110(6)(b)). This argument has no legs. The majority goes astray by conflating the definition of "follows" with the definition of, for example, "encounters."[14] If I encounter *487 a person on the street, then encounter them again at a different location, I could arguably be accused of following that person once. But I could not, despite the majority's reading, be accused of following that person twice.
¶ 72 Such a drastic broadening of the definition of "follows" also has imprudent policy ramifications. If, hypothetically, Kintz had maintained complete visual or physical proximity to both Westfall and Gudaz (i.e., hovered closely around them without any lapse in time or distance), his hovering would have constituted only one episode of following. He would not be guilty of stalking. But because Kintz briefly lost visual contact and had to regain immediate proximity to the womenin effect having less contact with the individuals over the course of conductunder the majority's reasoning he is guilty of stalking. This makes no sense.
¶ 73 I would hold in both the Westfall and Gudaz incidents that Kintz's acts comprised only a single occasion of following. There can be little doubt the interactions frustrated, angered, and upset both women. Kintz's conduct, and perhaps his demeanor, fell outside the norm exercised by most people. But because there was no repeated following, as required by RCW 9A.46.110(1)(a), there is insufficient evidence to convict Kintz of stalking by following.
¶ 74 I dissent.
CHAMBERS, J. (concurrence in dissent).
¶ 75 I agree with Justice Sanders that RCW 9A.46.110 is subject to more than one reasonable interpretation and that the rule of lenity requires that we find for the defendant. Therefore, I would reverse.
NOTES
[1] The State originally charged Kintz with two counts of felony stalking. At a pretrial hearing for Kintz's motion to dismiss, the parties stipulated that the both charges were erroneously filed as felonies and both charges were accordingly amended to gross misdemeanors.
[2] The verdict form contained two blank spaces with instructions to "write in not guilty or guilty" for each charge. CP at 22. The jury wrote "Guilty Guilty" in both blank spaces, which the trial judge treated as a finding of guilt on each charge. Id. at 16; see Kintz, J. & Sentence Cause No. 06-1-00324-4 (Aug. 9, 2006), at 2.
[3] Kintz also challenged (1) the sufficiency of the evidence of his identity for the charge relating to the encounters with Westfall, (2) the trial court's joinder of the stalking charges, (3) the trial court's admission of ER 404(b) testimony, (4) some of the prosecutor's questions to the defense expert witness as alleged prosecutorial misconduct, (5) the sentence as allegedly disproportionate, and (6) alleged cumulative error. State v. Kintz, noted at 144 Wash.App. 515, ¶¶ 19-50, 191 P.3d 62 (2008). In the unpublished portion of its opinion, the Court of Appeals rejected each of these arguments. Kintz did not seek review of any of these claims. See Appellant's Pet. for Discretionary Review at 4-5.
[4] In a footnote in his petition for discretionary review, Kintz claims for the first time that "it could be argued that the Stalking Statute is unconstitutionally vague." Appellant's Pet. for Discretionary Review at 16 n. 1. Kintz has not sought review of this claim nor has he set forth any argument in support of it. Although we decline to address this issue, we note that the Court of Appeals recently held that a vagueness challenge to the stalking statute was "meritless." State v. Haines, 151 Wash.App. 428, 439, 213 P.3d 602 (2009), review denied, 167 Wash.2d 1022, 225 P.3d 1011 (2010).
[5] Two amendments to the statute became effective subsequent to the filing of the informations charging Kintz. Laws of 2007, ch. 201, § 1 (amending subsections (5)(b)(v) and (6)); Laws of 2006, ch. 95, § 3 (amending subsection (5)(b)(v)). The amendments did not modify any of the terms relevant to this case.
[6] The statute further provides, "A finding that the alleged stalker repeatedly and deliberately appears at the person's home, school, place of employment, business, or any other location to maintain visual or physical proximity to the person is sufficient to find that the alleged stalker follows the person. It is not necessary to establish that the alleged stalker follows the person while in transit from one location to another." RCW 9A.46.110(6)(b).
[7] Kintz also urges our court to look to State v. Rico, 1999-158 (La.App. 3 Cir. 6/2/99), 741 So.2d 774 (considering undefined term "repeated" in Louisiana's stalking statute), for guidance with respect to determining what constitutes separate occasions. Appellant's Pet. for Discretionary Review at 12-14. The State contends that Rico does not compel the result sought by Kintz because Louisiana's stalking statute, unlike Washington's, did not define the terms "repeatedly" or "following." Suppl. Br. of Resp't at 19-20. The State also asserts that Rico is factually distinguishable from the instant case. We agree with the State's assertions.
[8] Kintz did not raise this argument in his petition for review. He argued this for the first time in the supplemental brief he presented after we granted review. This court will generally not consider issues raised for the first time in a supplemental brief filed after review has been granted. State v. Leyda, 157 Wash.2d 335, 340, 138 P.3d 610 (2006) (citing Douglas v. Freeman, 117 Wash.2d 242, 258, 814 P.2d 1160 (1991); RAP 13.7(b)). We choose to address Kintz's "layering" argument because the sufficiency of the evidence hinges on the correct reading of the statutory scheme.
[9] The dissent says it is perplexed by our citation of Haines. Dissent at 484-85. We have adopted the Court of Appeals' rationale in Haines because it disposes of various layering arguments that aim to multiply the "two or more separate occasions" in RCW 9A.46.110(6)(e) by either the "repeatedly" in RCW 9A.46.110(6)(b) or the "series of acts" in RCW 10.14.020(2). Contrary to the dissent's assertion, our holding today does not "transform both Haines's first and second acts into stalking." Dissent at 485. The two occasions of harassment in Haines continued without interruption until the defendant got in his car and drove away. See Haines, 151 Wash.App. at 430-32, 213 P.3d 602. The fact that these two occasions were separated by "[a] little over a month," id. at 431, 213 P.3d 602, simply makes that an easier case than this one, where breaks in contact were shorter.
[10] The dissent fashions an argument out of our heading, implying that the word "incident" rather than "incidents" is significant. RCW 9A.46.110 defines a single offense made up of multiple separate acts. The singular word "incident" corresponds to one count of stalking, not to the multiple occasions of following or harassment that made up this offense.
[11] The dissent says that the majority "goes astray by conflating the definition of `follows' with the definition of, for example, `encounters,'" which is defined as "`to come upon face to face,' `meet,' `a direct often momentary meeting,' or a `momentary or temporary contact.'" Dissent at 486 & n. 14 (quoting Webster's Third New International Dictionary 747 (2002)). The dissent hypothesizes: "If I encounter a person on the street, then encounter them again in a different location, I could arguably be accused of following that person once. But I could not ... be accused of following that person twice." Id. at 486-87. That is not what Kintz did; he did not simply show up at different points along Westfall's path. Whenever he appeared, he adjusted the speed and location of his van to match Westfall's; in the words of the statute, he "maintain[ed] visual [and] physical proximity" to her "over a period of time," and then drove away, only to reappear later and repeat the process.
[12] This is implicit in the dissent's contention that the stalking statute is subject to more than one reasonable interpretation when applied to the facts of Kintz's case. The "problem," as the dissent sees it, is that Kintz's interactions with Westfall or Gudaz can be seen as one "occasion" instead of "separate occasions." Id. at 483-84. This view assumes that the breaks in contact in this case were insignificant, and therefore may be disregarded. In other words, so little time separated one interaction from the next that these "occasions" cannot be seen as "separate." Of course, the statute asks the trier of fact to determine whether the alleged following or harassment occurred on "separate occasions." The dissent incorrectly characterizes what is a challenge to the sufficiency of the evidence as a challenge to the statutory language.
[1] Id.
[2] Unlawful harassment requires a "knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, harasses, or is detrimental to such person, and which serves no legitimate or lawful purpose...." RCW 10.14.020(1). A course of conduct is "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose." RCW 10.14.020(2).
[3] RCW 9A.46.110(1)(a).
[4] RCW 9A.46.110(6)(b).
[5] The majority misconstrues this statement. See majority at 481. It alleges, "Clearly, the `rudder' the dissent has in mind is some measurement of time that must transpire between the first and second occasions of following or harassment." Id. A time lapse could be a valuable instrument to determine separate occasions, as it was in State v. Haines, 151 Wash.App. 428, 213 P.3d 602 (2009), review denied, 167 Wash.2d 1022, 225 P.3d 1011 (2010), see infra pp. 484-85 but a predetermined length of time is not a requirement. The majority's claim to the contrary is unfounded and speculative.
[6] Majority at 475, 476.
[7] Id. at 476-77.
[8] The Court of Appeals characterized Haines's interactions with the victim as "both," which indicates the court found only two occasionsthe initial encounter and the second more than a month later. Haines, 151 Wash.App. at 437, 213 P.3d 602.
[9] The majority again misconstrues the dissent. See majority at 482. The dissent does not "downplay[] the threatening nature of the contacts," id. at 482, nor does it "minimiz[e] .. . the threatening nature of Kintz's behavior." Id. at 482. To the contrary, the dissent plainly recognizes the women's fear. See, e.g., supra p. 484 ("Both Westfall and Gudaz felt frightened due to the totality of their interaction with Kintz ...."); infra p. 487 ("There can be little doubt the interactions frustrated, angered, and upset both women."). The dissent does not comment on Westfall and Gudaz except to analogize potentially similar interactions which the majority newly criminalizes. This does not "downplay" the facts of this case. Majority at 482. The majority's allegation to the contrary is at best erroneous.
[10] This is the subtle distinction the majority fails to grasp. I do not disagree that "a person may follow by [maintaining visual or physical proximity to a specific person over a period of time] only once." Majority at 478. But maintaining visual or physical proximity itself requires multiple acts, e.g., U-turns.
[11] I agree with the majority that Kintz wrongly argues four occasions of following are required to establish sufficient evidence of stalking by following. Majority at 478. Two occasions of following are enough. I do, however, disagree with the majority's interpretation of "follows."
[12] The majority unconvincingly brushes aside the plain language of the statute by stating the example "is not part of the definition, only an illustration." Majority at 478. The majority's dismissal is inappropriate, however, because the "illustration" perfectly describes the facts of this case.
[13] The majority likewise breaks the Gudaz incident into "four discrete episodes." Majority at 479.
[14] Defined as "to come upon face to face," "meet," "a direct often momentary meeting," or a "momentary or temporary contact." Webster's, supra, at 747.