IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 28327-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RODOLFO RAMIREZ TINAJERO, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Rodolfo Ramirez Tinajero was convicted of the first degree rape of a woman he lured into an orchard with a promise of work. Among the evidence against him was testimony of another woman who claimed to have been the victim of an attempted rape by Mr. Tinajero[1] several months earlier, under similar circumstances. He was sentenced as a persistent offender to life in prison without the possibility of release.

He challenges his conviction on a number of grounds, with several arising out of the court's admission of testimony from the victim of the earlier alleged rape. We find only one error: that limited hearsay evidence was admitted in violation of his right of confrontation under the Sixth Amendment to the United States Constitution. Because

---

[1] The defendant is referred to as Mr. Tinajero throughout the record, which appears to be his preference.

other evidence was available to establish the same facts, the constitutional violation was harmless. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

Yakima police arrested Rodolfo Ramirez Tinajero for the first degree rape of Maria V. in August 2007, within a week and a half after the rape occurred. Mr. Tinajero had previously been identified as a suspect or person of interest in the attempted first degree rape of another woman, Beatriz S., which had taken place four months earlier, in April.

Maria V., the victim in this case, had been working in the fields in 2007 and on the day of the rape drove her car, alone, to the Buena area, hoping to find work. She made several stops and inquiries without success until encountering Mr. Tinajero, who told her that he could direct her to a place where workers were being hired and that she should follow his car.

She followed him to an orchard where he stopped, stepped out of his car, walked to her car, and told her he believed they were not going to start work that day. Seeing that there was no one working there, she said she was going to leave, at which point he said "no," pulled out a knife, and said "you're not going to leave, you're going to do what I tell you to do now." Report of Proceedings (RP) at 654. He ordered her to walk into the orchard. When he reached a remote location, he raped her, holding his knife to her neck.

2

After he was finished, he walked her back to where their cars were parked, ordered her to stand at her car looking away from his, and then drove off. She drove back to her home, where her husband saw that she was upset and asked her what was wrong. She only reluctantly told him what had happened. He drove her to the police station where she spoke to officers. They suggested that she go to the hospital, which she did, the next morning; a rape kit was taken. She later spoke to Yakima County Sheriff's Detective Richard Mottice.

Her description of the man who raped her included the fact that he had a gap in his teeth. For that reason, Detective Mottice showed her a photo montage prepared for his investigation of the attempted rape of Beatriz S.; Ms. S. had provided a similar description of the man who assaulted her. Mr. Tinajero had a gap in his teeth and his picture had been included in the montage. Ms. S. had not identified anyone from the montage but Ms. V. immediately identified Mr. Tinajero as the man who raped her.

Mr. Tinajero was charged, an arrest warrant issued, and he was arrested within a few days. Following his arrest, Detective Mottice went to speak with him at the Yakima County jail, where Mr. Tinajero was read his *Miranda*[2] rights and agreed to give a recorded statement. When the detective asked Mr. Tinajero if he forced Ms. V. to have sex with him, Mr. Tinajero replied, "It happened, but—but not forcefully. It wasn't

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

forced." RP at 1070. He claimed that Ms. V. discussed her need for money, asked if there was something she could do for him, agreed to have intercourse that then occurred in the orchard, and that he paid her with a $50 bill.

The detective also took the opportunity to ask Mr. Tinajero questions related to his investigation of the April rape attempt of Ms. S. He first asked if Mr. Tinajero had a cell phone. Ms. S. had been lured to the orchard where she was assaulted through a phone call and had been able to provide the telephone number. Mr. Tinajero admitted having a phone and provided the same number reported by Ms. S. The detective posed further questions to Mr. Tinajero about the earlier crime, including whether he had met a woman in an orchard on Progressive Road, whether he attempted to rape her, and how many calls Mr. Tinajero might have made to her from his cell phone. Mr. Tinajero's responses were inconsistent and unnatural. Among other statements, he said, "I didn't have anything to do with her," "With that person, we just happened to meet there," and that if he did call her it was "maybe" "if on one occasion I—I have called or something, it was something they advertised on the radio where they sell things or something. That's when I have called, but not for anything else." RP at 1073-75.

Following the interview, the detective obtained a warrant to search Mr. Tinajero's apartment. Among items seized during the search was a certificate of title to a red Nissan Sentra that matched Ms. V.'s description of the car Mr. Tinajero drove on the day of the rape. The Nissan was parked outside the apartment. The detective found another

4

certificate of title (although not in Mr. Tinajero's name) for a 1984 gray Nissan with the license number 911 MXF, parked next to the red Nissan. The gray Nissan matched Ms. S.'s description of the car driven by the man who attempted to rape her, including its license plate number, which Ms. S. had written down upon reaching her own car. The police also found a utility knife and a pocketknife on the back porch.

Before Mr. Tinajero's trial for the rape of Ms. V. the State provided notice that it intended to offer the testimony of Ms. S., relying on RCW 10.58.090. At the time of the State's motion, the statute provided for liberal admission of evidence of a defendant's other sex offenses, essentially rejecting limitations that would otherwise apply under ER 404(b). The statute required the State to disclose the evidence in advance and the court to determine that the evidence was not unduly prejudicial. In light of the State's notice, the trial court considered whether to admit Ms. S.'s testimony under the statute or, alternatively, under ER 404(b) at a pretrial hearing.

At the time of the hearing, the State called Ms. S., Detectives Mottice and Robert Tucker, and Juan Rodriguez, who had served as an interpreter when Detective Mottice conducted his jailhouse interview of Mr. Tinajero. Ms. S. testified that she had responded earlier in 2007 to a telephone number given in connection with a radio advertisement of farm work. In several calls to and from what proved to be Mr. Tinajero's phone number, she was told by a man how to get to the orchard where work was available and to meet him there if she wanted to begin work the following week.

5

When she arrived at the location he had described, there was a man wearing work gloves and appearing to be pruning grapes with loppers but no one else was working in the vicinity. When she pulled over, he identified himself as the man who had spoken to her and told her to follow him to where she would be working. As she followed him farther into the orchard she became uneasy and reluctant to continue. At that point he pulled out a knife, held it to her neck, and forced her to walk to a more secluded area where he attempted to rape her. Police later recovered a pair of gloves and loppers in the vicinity of the attempted rape; Ms. S. identified them as similar to those of her attacker. By the time of the hearing, DNA (deoxyribonucleic acid) results had identified Mr. Tinajero's DNA on the gloves.

At the hearing, Mr. Tinajero challenged the constitutionality of RCW 10.58.090 on ex post facto grounds but the court rejected his argument. It found the evidence of the attempted rape of Ms. S. to be admissible under both the statute and ER 404(b). In support of its ruling on ER 404(b), it made findings that the act was established by a preponderance of the evidence; was admissible as evidence of a common scheme or plan, intent, and identity; and that its probative value outweighed the risk of prejudice.

At trial, Mr. Tinajero's lawyer informed the court that his client wished to testify but wanted advance assurance that if direct examination was limited to the events of the afternoon of the alleged rape of Ms. V., the State would not be permitted to examine him about the earlier attempted rape of Ms. S. The defense lawyer expressed Mr. Tinajero's

desire to preserve his Fifth Amendment right as it related to the State's charges concerning Ms. S. Evidence of the attempted rape of Ms. S. had, by that point, already been admitted. The court refused to rule out cross-examination in advance, stating it would consider objections to particular questions during examination. Mr. Tinajero elected not to testify.

The jury found Mr. Tinajero guilty of first degree rape and found by special verdict that he committed the crime while armed with a deadly weapon.

At sentencing, the trial court concluded Mr. Tinajero was a persistent offender. It relied for the predicate offense on Mr. Tinajero's conviction in 1994, pursuant to an *Alford*[3] plea, of first degree burglary with sexual motivation.

Mr. Tinajero timely appealed. His appeal was stayed pending a decision by the Washington Supreme Court on the constitutionality of RCW 10.58.090. In 2012, the court held that the statute violated constitutional separation of the judicial and legislative powers. *State v. Gresham*, 173 Wn.2d 405, 432, 269 P.3d 207 (2012). Supplemental briefs were filed and this appeal was argued thereafter.

## ANALYSIS

With the Supreme Court having decided the issue of RCW 10.58.090's constitutionality in Mr. Tinajero's favor, the following assignments of error remain:

---

[3] *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

(1) the testimony of Ms. S. was erroneously admitted under ER 404(b); (2) admitting

evidence of the attempted rape of Ms. S. denied Mr. Tinajero the right to testify in his

own defense; (3) admitting evidence under RCW 10.58.090 deprived Mr. Tinajero of his

right to a constitutionally mandated suppression hearing; (4) his right of confrontation

was violated by admission of hearsay information obtained from a 911 operator; (5) he

received ineffective assistance of counsel when certain State evidence came in without

objection; (6) insufficient evidence supports the deadly weapon enhancement; and (7) the

court improperly relied upon an *Alford* plea as a prior conviction in finding him to be a

persistent offender. We address the issues in turn.

## I. ER 404(b) Evidence

In light of the determination that RCW 10.58.090 is unconstitutional, the propriety

of admitting Ms. S.'s testimony turns on whether it satisfied the requirements of ER

404(b). We may affirm the trial court on any correct ground. *Gresham*, 173 Wn.2d at

419. Mr. Tinajero contends that the evidence cannot be defended as bearing on the issues

of intent, motive, or common scheme or plan; that the court erred in balancing its

prejudicial effect against its probative value; and that the court's limiting instruction was

inadequate.

ER 404(b) prohibits the use of evidence of other crimes, wrongs, or acts to prove

the character of a person in order to show conformity therewith. In addition to addressing

that prohibited purpose, the rule contains an illustrative list of purposes for which

8

evidence of prior bad acts may be used: "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b).

The analytical approach for determining whether prior acts evidence is admissible under ER 404(b) is well settled. The trial court must "'(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.'" *Gresham*, 173 Wn.2d at 421 (quoting *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). It must conduct its analysis on the record. *State v. Sublett*, 156 Wn. App. 160, 195, 231 P.3d 231 (2010), *aff'd*, 176 Wn.2d 58, 292 P.3d 715 (2012).

Here, the trial court found that the preponderance of the evidence established that Mr. Tinajero committed the acts alleged by Ms. S.[4] and identified three purposes for which the evidence was proposed to be offered and would be relevant: identity, intent, and common scheme or plan.

We review the trial court's decision to admit evidence under ER 404(b) for an abuse of discretion. *State v. Foxhoven*, 161 Wn.2d 168, 174, 163 P.3d 786 (2007).

---

[4] Mr. Tinajero argues for the first time in his reply brief that the State did not prove the acts alleged by Ms. S. by a preponderance of evidence. We will not consider an issue raised and argued for the first time in a reply brief. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

9

A. Purpose for Which Evidence Was Offered and Admitted

*Identity.* Where the identity of a defendant as the perpetrator of an act is in dispute, evidence of his or her prior acts may be relevant "if the method employed in the commission of both crimes is 'so unique' that proof that an accused committed one of the crimes creates a high probability that he also committed the other crimes with which he is charged." *State v. Russell*, 125 Wn.2d 24, 66-67, 882 P.2d 747 (1994). The method must be unusual and distinctive as to act like a signature. *Id.* at 67. "Evidence of prior misconduct is admissible to prove identity only if identity is actually at issue." *State v. Sanford*, 128 Wn. App. 280, 286, 115 P.3d 368 (2005) (citing *State v. Bowen*, 48 Wn. App. 187, 193, 738 P.2d 316 (1987), *overruled on other grounds by State v. Lough*, 125 Wn.2d 847, 889 P.2d 487 (1995)).

Mr. Tinajero argues, correctly, that identity was not an issue in this case. While the State was required to prove that Mr. Tinajero engaged in sexual intercourse with Ms. V., he admitted that element. A trial court abuses its discretion when it applies the wrong legal standard or bases its ruling on an erroneous view of the law. *State v. Hudson*, 150 Wn. App. 646, 652, 208 P.3d 1236 (2009). Since identity was not at issue, the trial court erred in relying on identity as a permissible purpose for admitting Ms. S.'s testimony.

*Intent.* Mr. Tinajero also argues correctly that intent is not logically relevant to a material issue before the jury where intercourse is admitted and the parties dispute whether it took place with consent or as a result of forcible compulsion. *State v.*

10

*Saltarelli*, 98 Wn.2d 358, 362, 655 P.2d 697 (1982). *Saltarelli* is controlling. In that case, as in this, the defendant admitted to having intercourse with the victim but claimed it was consensual. The court concluded that in such cases "intent [is] not an 'essential point which the state [is] required to establish.'" *Id.* at 366 (quoting *State v. Goebel*, 40 Wn.2d 18, 22, 240 P.2d 251 (1952), *overruled on other grounds by Lough*, 125 Wn.2d 847). From this, it held that evidence of a prior assault of a different victim should not be admitted for the purpose of showing intent. *Id.*

The only distinguishing circumstance is that here, at the State's request, the trial court instructed the jury on the meaning of "intent" because "the State wants to argue intent as an issue. The Defendant's intent versus—forcible compulsion as opposed to the consent." RP at 1140. In arguing that intent can be an *issue* even if not an element, the State's position parallels the reasoning of three dissenters in *Saltarelli*, who would have held that "[i]ntent . . . does not have to be an element of the crime in order for evidence to be admissible" and that "Saltarelli *affirmatively* placed his intent in issue when he testified that he had engaged in sexual intercourse with the victim, but that it was consensual." *Saltarelli*, 98 Wn.2d at 367 (Dore, J., dissenting).

The dissent's reasoning did not carry the day in *Saltarelli* and we cannot ignore the majority's focus on the fact that intent was not an element. Intent is not an element of either first or second degree rape, the crimes on which the jury was instructed here. RCW 9A.44.040, .050. *Saltarelli* remains controlling law that a defense claim of consent

11

does not thereby make intent a material issue. The fact that "intent" was defined for the jury cannot make a difference.

*Common scheme or plan.* The final purpose for which the court admitted Ms. S.'s testimony was as evidence of a common scheme or plan. "There are two instances in which evidence is admissible to prove a common scheme or plan: (1) 'where several crimes constitute constituent parts of a plan in which each crime is but a piece of the larger plan' and (2) where 'an individual devises a plan and uses it repeatedly to perpetrate separate but very similar crimes.'" *Gresham*, 173 Wn.2d at 421-22 (quoting *Lough*, 125 Wn.2d at 854-55). In the second instance, evidence of the prior act is offered to show that the defendant developed a plan and has again put that particular plan into action. *Id.* at 422; *Lough*, 125 Wn.2d at 852.

To be admissible, the "evidence of prior conduct must demonstrate not merely similarity in results, but such occurrence of common features that the various acts are naturally to be explained as caused by a general plan of which the charged crime and the prior misconduct are the individual manifestations." *Lough*, 125 Wn.2d at 860 (citing *People v. Ewoldt*, 7 Cal. 4th 380, 402, 867 P.2d 757, 27 Cal. Rptr. 2d 646 (1994)). The degree of similarity must be substantial to be relevant, but uniqueness of the acts is not required. *State v. DeVincentis*, 150 Wn.2d 11, 20-21, 74 P.3d 119 (2003).

Critics have argued that prosecutors' use of prior acts evidence to demonstrate a "common scheme or plan" has come to exceed its original rationale, with courts

12

increasingly allowing the State to present evidence of "'spurious plans,'" or, stated differently, a "plan-to-commit-a-series-of-similar-crimes theory." 1 EDWARD J. IMWINKELRIED, UNCHARGED MISCONDUCT EVIDENCE § 3:24 (rev. ed. 2009); *and see* Jeannie Mayre Mar, *Washington's Expansion of the "Plan" Exception after* State v. Lough, 71 WASH. L. REV. 845 (1996). Mr. Tinajero relies on these criticisms and on *State v. Harris*, 36 Wn. App. 746, 677 P.2d 202 (1984) to argue that the trial court misapplied the common scheme or plan basis for admission in his case.

*Harris* held that the trial court abused its discretion when it denied a defense motion to sever prosecution of charges of two separate rapes. The appellate court concluded that the facts that "'both victims voluntarily entered vehicles with the defendants and in both instances the defendants drove the victims against their will to a location where the rapes occurred'" did not qualify as part of a common scheme or plan. *Id.* at 751 (quoting the State's argument). In reaching this conclusion, the 1984 decision relied on a meaning of "common scheme or plan" that required that the rapes qualify as "links in a chain forming a common design, scheme or plan." *Id.* It is only since then that our Supreme Court has held in *Lough*, and reaffirmed in *Gresham*, that evidence admissible as tending to prove a common scheme or plan can include evidence of a plan, devised by a defendant, that it has used repeatedly to perpetrate separate but very similar crimes.

13

In decisions following *Lough*, Washington courts have found sufficient similarity between a charged rape and a prior act where the victims were of a similar age, involved with drugs, and were attacked in a similar manner that involved a promise of drugs, an attack from behind with a forearm across the throat, and strangulation. *State v. Williams*, 156 Wn. App. 482, 234 P.3d 1174 (2010). In another case, the molestation of two girls was sufficiently similar to reflect a common scheme or plan where the defendant was in a position of authority over both, both were about the same age when molested, and the defendant's criminal conduct involved isolating the girls, forcing them to take nude photographs and watch pornography, and fondling them. *State v. Sexsmith*, 138 Wn. App. 497, 502, 157 P.3d 901 (2007).

Turning to the facts presented in this case, Mr. Tinajero argues that the fact that both crimes took place in orchards is not enough to make them substantially similar, particularly because both were committed in largely agricultural Yakima County. The attempted rape and rape had more common features than that, however. In both cases, Mr. Tinajero targeted female field workers; used the fact that they were seeking work to lure them to remote agricultural locations; used the pretense of showing them where the work was to be performed to isolate them further (as long as that ruse worked); and, when he was at risk of them leaving, forced them at knifepoint into the interior of an orchard where he then assaulted them.

14

In assessing whether the trial court abused its discretion, it is apparent that it abided by the rule's procedural requirement that it identify a permitted use of the evidence. In the case of this proposed purpose for offering the evidence, the court correctly understood that "common scheme or plan" can include evidence of a plan, devised by a defendant, that he has used repeatedly to perpetrate separate but very similar crimes. When the trial court has correctly interpreted the rule, we review whether its decision to admit the evidence was based on tenable grounds and reasons. There were tenable grounds in this case for the trial court's conclusion that the two incidents had enough common features to naturally be explained as caused by a general plan. Ms. S.'s accusation was admissible as evidence of a common scheme or plan.

B. Probative Value vs. Unfair Prejudice

Mr. Tinajero's next challenge to admission of Ms. S.'s testimony under ER 404(b) is that the trial court erred in determining whether the probative value of the evidence was substantially outweighed by unfair prejudice. ER 403. Nearly all evidence is prejudicial in the sense that it is offered for the purpose of inducing the trier of fact to reach one conclusion and not another. 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 403.3 (5th ed. 2007). ER 403 is concerned with "unfair prejudice,"

> usually meaning prejudice caused by evidence that is more likely to arouse an emotional response than a rational decision among the jurors. If the evidence is distinctly prejudicial in this sense, and if other less

15

inflammatory evidence is available to adequately make the same point, the balance is tipped towards exclusion.

*Id.* at 441-42 (footnote omitted).

The trial court recognized that the evidence of the attempted rape of Ms. S. was prejudicial because it suggests that Mr. Tinajero is a sexual predator. But Ms. V. was already accusing him of rape. The principal prejudice that would be created by the evidence was its tendency, rationally, to make the existence of a plan by Mr. Tinajero to isolate Ms. V. and rape her more probable than it would be without the evidence of the attempted rape of Ms. S. *Cf.* ER 401 (defining "relevant evidence" as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence). There was no less inflammatory evidence that could make the same point. The trial court recognized that there was a need for such evidence "in the context of these situations of secret behavior of attempting to draw women into these private areas where there's no—not a lot of witnesses and no opportunity for the public to observe what's going on." RP at 611-12. The trial court did not abuse its discretion in analyzing the admissibility of the evidence under ER 403.

## C. Limiting Instruction

Mr. Tinajero finally argues that the trial court failed to prevent jury misuse of Ms. S.'s testimony because it gave an inadequate limiting instruction. Before Ms. S. testified,

16

the court told the jury:

> [The] evidence pertaining to [Ms. S.] is being admitted in this case for limited purposes only. In deciding the crime alleged in this case, the testimony of [Ms. S.] may be considered by you only for the purposes of evidence of a common scheme or plan by the Defendant and evidence of the Defendant's identity and intent.
>
> You may not consider this evidence from this witness for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation.

RP at 827-28. The court repeated the admonition in its concluding instructions. By failing to define "common scheme or plan" Mr. Tinajero argues that the court allowed the jury to interpret the phrase as meaning "'he did it before, so he probably did it again.'" Br. of Appellant at 18.

Mr. Tinajero's lawyer saw the instruction before it was first given and, when asked by the trial court if he wanted a limiting instruction given, said that he did. He objected only to identity and intent being included as purposes for which the evidence was offered. He did not propose a definition of "common scheme or plan."

We note that in *State v. Yates*, 161 Wn.2d 714, 749-50, 168 P.3d 359 (2007), the Supreme Court held that "common scheme or plan" consists of commonly understood words and need not be defined but, if it were to be defined, could be explained as occurring "'when a person devises an overarching criminal plan and uses it to perpetrate separate but very similar crimes.'" We doubt that such a definition would have been helpful to Mr. Tinajero.

17

In any event, Mr. Tinajero did not offer a definition or otherwise object to the failure to give a definition at the time of trial. He thereby waived any right to assign error on appeal. *Cf. Williams*, 156 Wn. App. at 492 (failure to request a limiting instruction for ER 404(b) evidence waives the right to assign error on appeal).

## II. Refusal to Limit Cross-Examination

Mr. Tinajero assigns error to the trial court's refusal to place an advance limitation of the State's cross-examination if he were to take the stand, which he argues caused him to forgo his right to testify. He characterizes the court's decision as presenting him with an impermissible Hobson's choice. Suppl. Br. of Appellant at 13.

In *State v. Hardy*, 133 Wn.2d 701, 706, 946 P.2d 1175 (1997), our Supreme Court found reversible error where a trial court admitted a defendant's prior felony drug conviction in his trial for robbery despite stating on the record that "'[t]he impeachment value of the prior crime is almost nil' and as a drug crime it would be particularly prejudicial given the anti-drug 'fever.'" (Alteration in original.) In dicta, the decision observed that the threat of admitting inherently prejudicial prior drug convictions places an accused in the position of either forgoing testifying in his own defense or testifying and risking portrayal as a criminal, adding that "[f]orcing the accused to such a Hobson's choice is not favored." *Id.* at 711.

To say that presenting an accused with a Hobson's choice "is not favored" is not to say that it will never be tolerated. A Hobson's choice is sometimes inherent in what is

18

ultimately a truth-seeking process, and even a reason for constitutionally assuring that the accused *has* a choice. While Mr. Tinajero argues otherwise and asserts that the appropriate remedy anytime a defendant is presented with such a choice is dismissal of the charges, the cases that he relies upon—*State v. Price*, 94 Wn.2d 810, 620 P.2d 994 (1980) and *State v. Smith*, 67 Wn. App. 847, 841 P.2d 65 (1992)—do not support his argument.

In *Price*, the defendant's right to a speedy trial was at issue, including whether he should be viewed as responsible for a delay that he requested, but only because of a late amendment of charges by the State. The Hobson's choice was between his right to a speedy trial and his right to be represented by counsel with a sufficient opportunity to adequately prepare a material part of the defense. The Supreme Court recognized that "*unexcused conduct by the State* cannot force a defendant to choose between these rights." *Price*, 94 Wn.2d at 814 (emphasis added). There was no suggestion that a defendant would be entitled to relief if a conflict between his interest in a speedy trial and a need for more defense preparation arose through no fault of the State.

In citing *Smith*, Mr. Tinajero cites the dissenting opinion, not the majority. The majority refused to dismiss charges against the defendant, distinguishing *Price* because in that case the accused demonstrated both the State's lack of diligence and its interjection of new material facts into the case. In *Smith*, "there was no real exploration of why

19

discovery was late. . . . The trial court made no findings with regard to the State's diligence." 67 Wn. App. at 854.

This case is more like *State v. Brown*, 113 Wn.2d 520, 782 P.2d 1013, 787 P.2d 906 (1989), in which our Supreme Court held that a trial court's refusal to preclude the State from using a defendant's prior conviction to impeach him did not present a Hobson's choice violating the defendant's constitutional right to testify in his own defense. The court acknowledged that a ruling admitting prior conviction evidence for impeachment purposes has an impact upon a defendant's right. Nonetheless, "while a defendant's decision to testify may be affected by the possibility of impeachment by prior conviction, . . . a defendant has no constitutional right to testify free of such impeachment." *Id.* at 554. Elsewhere, it quoted the United States Supreme Court's decision in *McGautha v. California* with approval:

> "The criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose. The threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved."

*Id.* at 539-40 (quoting *McGautha v. California*, 402 U.S. 183, 213, 91 S. Ct. 1454, 28 L. Ed. 2d 711 (1971), *vacated in part on other grounds by Crampton v. Ohio*, 408 U.S. 941, 92 S. Ct. 2873, 33 L. Ed. 2d 765 (1972)).

The Hobson's choice with which Mr. Tinajero was presented was not the result of any misconduct by the State. Nor was it one that could be avoided in a manner that would protect the interests of both Mr. Tinajero and the State. If Mr. Tinajero were to testify, justice required that he be subject to reasonable cross-examination. The trial court did not abuse its discretion in refusing to foreclose areas of cross-examination in advance.

### III. Fifth Amendment Right

Mr. Tinajero next argues that an unintended consequence of admitting evidence of Ms. S.'s allegation of attempted rape under RCW 10.58.090 was an alleged deprivation of his opportunity to challenge the evidence under CrR 3.5 and CrR 3.6—in particular, a deprivation of his opportunity to challenge police testimony and the photomontage, both of which he characterizes as indirectly informing the jury that the police had reason to suspect Mr. Tinajero of such crimes even before the attempted rape of Ms. S. The following argument appears to be at the heart of this assignment of error:

> Because RCW 10.58.090 allowed evidence of guilt concerning the prior accusation—but not regarding the conduct of the prior investigation—the defense was unable to challenge evidence that may have been unlawfully obtained. This effectively divested Mr. Tinajero of the protection of Article I, section 7 of the Washington Constitution and the Fourth Amendment to the U.S. Constitution.

Suppl. Br. of Appellant at 18. Two premises of this argument are unexplained and certainly appear to be wrong.

First, nothing in RCW 10.58.090 foreclosed Mr. Tinajero from presenting evidence regarding the conduct of law enforcement's earlier investigation if he thought such evidence would be helpful to him, in the suppression hearing or otherwise. The only suggestion we have as to why he claims the statute did not allow evidence of the prior investigation is his statement, elsewhere in his brief, that "defense counsel was not permitted to mention that Tinajero had been charged in the [case of Ms. S.]. Therefore, counsel could not challenge the constitutionality of that investigation—specifically, the existence of probable cause to detain Mr. Tinajero, which strongly appears to be lacking." Suppl. Br. of Appellant at 20. In support of this statement, he cites to the trial court's oral ruling that it would admit evidence of the attempted rape of Ms. S.

The record he cites includes the court's statement, in announcing its ruling, that "[t]here is no prior conviction here. Right now it's a charged act, but *we're not going to get into that*, as far as *the State will not be permitted to discuss the fact that this actually is a charge in court right now*." RP at 612 (emphasis added). In context, the court appears to have expressed this limitation for Mr. Tinajero's benefit. Mr. Tinajero did not object to the limitation. Moreover, the statement was made at the conclusion of the suppression hearing, well after Mr. Tinajero would have had his opportunity to present any constitutional challenge to evidence based on the conduct of the State's past investigation of his possible involvement in crime.

22

Second, CrR 3.5 and 3.6 place no limitations on the bases on which a defendant may challenge the admissibility of defendant's statement or the physical, oral, or identification evidence that a defendant may move to suppress. The court conducted a pretrial hearing under CrR 3.5 in light of the State's intention to offer Mr. Tinajero's statement in which Mr. Tinajero challenged its admission. He argued only that he was not properly informed of his rights and did not waive them. He has not assigned error to the trial court's ruling that his statement was voluntary and would be admitted. The pretrial hearing was Mr. Tinajero's opportunity to raise any constitutional challenge to evidence he claimed was tainted by constitutional violations by the State.

Mr. Tinajero does not persuade us that RCW 10.58.090 presented any impediment to his right to move for the suppression of evidence obtained in violation of the federal or state constitutions.

## IV. Violation of Confrontation Right

Mr. Tinajero's next assignment of error is to hearsay testified to by a patrol sergeant that came in without objection. He does not assign error on the basis of its hearsay character, which would be unavailing given his failure to object below. He argues that it violated his right of confrontation under the Sixth Amendment to the United States Constitution. Although he failed to object in the trial court on that ground as well, a confrontation clause challenge is a constitutional challenge; as a consequence, he may raise the challenge for the first time on appeal if the alleged error is "manifest," i.e., had

23

practical and identifiable consequences in the trial of the case. *State v. Kronich*, 160 Wn.2d 893, 899, 161 P.3d 982 (2007), *overruled on other grounds by State v. Jasper*, 174 Wn.2d 96, 116, 271 P.3d 876 (2012). We review an alleged violation of the confrontation clause de novo. *Jasper*, 174 Wn.2d at 108.

The Sixth Amendment's confrontation clause, made applicable to the states by the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. It bars the admission of the testimonial hearsay statements of a witness who does not appear at trial unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness under oath. *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). "It is the *testimonial character* of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) (emphasis added).

In *Crawford*, the Supreme Court did not give a comprehensive definition of "testimonial" but observed that the core class of "testimonial" statements include those "pretrial statements that declarants would reasonably expect to be used prosecutorily." 541 U.S. at 51. Thereafter, in *Davis*, the Supreme Court held that "[s]tatements are . . . testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past

24

events potentially relevant to later criminal prosecution." 547 U.S. at 822. A witness's statement to an officer need not exist in formal form to be a testimonial statement; the requirements of the confrontation clause cannot be evaded by having a note-taking policeman recite the unsworn hearsay testimony of a declarant. *Id.* at 826.

During the State's case it called Sergeant Mike Russell, who was the first officer to respond to Ms. S.'s call reporting that she had been assaulted. Sergeant Russell testified that Ms. S. provided him with the telephone number used by the man who spoke to her by phone and arranged for her to travel to the location where Mr. Tinajero attempted to rape her. The following questions were then asked and answers given:

Q . . . [W]ere you able to make any kind of determination who was associated with that telephone number?
A Not immediately, but throughout the course of over the next couple of hours, I was able to, yes.
Q All right. And how did you do that?
A I called the 911 information center and explained to a supervisor there that we had some—
Q I respectfully interrupt for certain reasons. Did you—does 911 do that kind of work to try to associate phone numbers with the persons who have those numbers?
A Not customarily.
Q Okay. And after explaining to them what your need was, were they able to do the work that you requested and determine whose telephone number that was?
A Because of the urgency of the matter, they were.
Q All right. And whose telephone number was that, according to the information those persons provided you with?
A They told me that it belonged to Rodolfo Tinajero.

RP at 966.

25

The State argues that the telephone number provided by the supervisor at the 911 center was not testimonial because he or she would not reasonably expect the statement to be used prosecutorily. We disagree. A supervisor asked to provide a telephone number to a police officer investigating the source of a call from a perpetrator of a crime would reasonably expect that the information provided, if helpful, would be used. And the State fails to address *Davis*'s holding that information obtained from a witness by law enforcement is testimonial if the primary purpose of requesting the information is to establish or prove events potentially relevant to later criminal prosecution. If there was any urgency (in the sense of exigency) here, it is unexplained. The supervisor's statement that the telephone number was Mr. Tinajero's was therefore testimonial and subject to the confrontation clause.

The error was not manifest, however, because it had no practical and identifiable consequences in the trial of the case. The parties were aware that the telephone number's association with Mr. Tinajero had already been established through Detective Mottice's testimony and could also be established through a document seized during the search of Mr. Tinajero's apartment. When the State later sought to offer the document from the apartment reflecting the name "Rodolfo," and next to that, the telephone number, Mr. Tinajero's lawyer commented at sidebar on the fact that his client's telephone number had already been established, stating, "Your Honor, I think the testimony by Deputy Russell, I believe, indicated—and also from Detective Mottice—that my client's phone

26

number is that number, so I don't see the relevance." RP at 1088. The confrontation clause challenge therefore cannot be raised for the first time on appeal.

Confrontation clause error may also be harmless. *State v. Mason*, 160 Wn.2d 910, 927, 162 P.3d 396 (2007). Whether the error is harmless is analyzed under the "overwhelming untainted evidence" test: if the untainted evidence is overwhelming, the error is deemed harmless. *Id.* (citing *State v. Davis*, 154 Wn.2d 291, 305, 111 P.3d 844 (2005), *aff'd*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006)). "If there is no 'reasonable probability that the outcome of the trial would have been different had the error not occurred,' the error is harmless." *Id.* (quoting *State v. Powell*, 126 Wn.2d 244, 267, 893 P.2d 615 (1995)).

The evidence against Mr. Tinajero can fairly be characterized as overwhelming and there was, as explained, other evidence of Mr. Tinajero's telephone number that was admitted or available. Any error was harmless.

V. Ineffective Assistance of Counsel

Mr. Tinajero next claims he received ineffective assistance due to his counsel's failure to object to hearsay evidence provided by Ms. V.'s husband, two medical providers, and Sergeant Russell. Mr. Tinajero argues that all of this evidence was inadmissible, objections to it would have been sustained, and there was no tactical reason for allowing it to come in without objection.

The Sixth Amendment and article I, section 22 of the Washington State Constitution guarantee the right to counsel, but more than the mere presence of an attorney is required. *State v. Hawkins*, 157 Wn. App. 739, 747, 238 P.3d 1226 (2010). The attorney must perform to the standards of the profession. *Id.* A claim for ineffective assistance presents a mixed question of law and fact, which we review de novo. *State v. Cross*, 156 Wn.2d 580, 605, 132 P.3d 80 (2006); *State v. Cham*, 165 Wn. App. 438, 445, 267 P.3d 528 (2011), *modified on remand*, noted at 172 Wn. App. 1002 (2012).

To establish a claim for ineffective assistance of counsel, the defendant must prove that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Nichols*, 161 Wn.2d 1, 8, 162 P.3d 1122 (2007); *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). Deficient performance is that which falls "below an objective standard of reasonableness based on consideration of all the circumstances." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Prejudice exists if the defendant can show that "there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different." *Nichols*, 161 Wn.2d at 8.

In evaluating claims for ineffectiveness, courts are highly deferential to counsel's decisions and there is a strong presumption that counsel performed adequately.

28

*Strickland*, 466 U.S. at 689-91. Strategic and tactical decisions are not grounds for error. *Id.*

Where it is a failure to challenge the admission of evidence that is alleged to constitute ineffective assistance, the defendant must show (1) an absence of legitimate strategic or tactical reasons supporting the challenged conduct, (2) that an objection to the evidence would likely have been sustained, and (3) that the result of the trial would have been different had the evidence not been admitted. *State v. Saunders*, 91 Wn. App. 575, 578, 958 P.2d 364 (1998).

## A. Testimony of Ms. V.'s Husband

We first address the hearsay admitted during the examination of Ms. V.'s husband.

The State called Ms. V.'s husband to testify, in part, to her demeanor following the rape and her report to him of what happened. Mr. Tinajero's lawyer then cross-examined her husband at length about his recollection of her appearance including cuts or scratches he observed, her initial reticence to tell him what happened, and her eventual recount of the rape. Cross-examination also established that neither Ms. V. nor her husband had been working regularly and they needed money.

Mr. Tinajero argues that the testimony was inadmissible under any exception to the hearsay rule. He characterizes the husband's testimony as "coincid[ing] with [Ms. V.'s] only sporadically, exagerrat[ing] gory details, and invent[ing] new ones." Br. of Appellant at 46. He asserts, conclusorily, that "[n]o legitimate strategy can account for

29

counsel's lapse. The State's entire case depended on persuading the jury to believe [Ms. V.]." *Id.*

The strategy is evident from Mr. Tinajero's own argument. Mr. Tinajero admitted he had sexual intercourse with Ms. V. Her testimony that she had been raped was emphatic. He surely anticipated that he might not testify in his own defense. Under the circumstances, he needed to be able to point to some evidence casting doubt on Ms. V.'s testimony.

Although the closing arguments were not provided in our record on appeal, Mr. Tinajero's opening statement suggests that his defense would be based on incongruity in Ms. V.'s version of events and inconsistencies between her recollection and what she told Detective Mottice. The record reveals that thereafter, Mr. Tinajero's lawyer was able to interview Ms. V.'s husband, who had been on an immigration hold in Tacoma and was transported by the State to Yakima to testify. Cross-examination reveals that when interviewed, the husband had been voluble and adamant about details recounted to him almost two years before, which were inconsistent in many cases with Ms. V.'s testimony. With the return to Yakima of the talkative husband, it appears likely that Mr. Tinajero's lawyer viewed cross-examining the husband as a further opportunity to undermine, not strengthen, the credibility of Ms. V.—the only defense strategy apparently available.

Mr. Tinajero also fails to address the prospect that the husband's recount of his wife's statements would be admissible as an excited utterance. We need not examine that

30

further, however, because the decision not to object and instead to cross-examine extensively could so clearly have been tactical.

### B. Dr. George Seymour and Nurse Margaret Littlefield

Dr. Seymour and Nurse Littlefield testified about their treatment of Ms. V. at Toppenish Community Hospital, where she was seen about midday on the day following the rape. Neither provider recalled Ms. V. or their treatment of her, so both referred to hospital records in answering questions from the prosecutor and Mr. Tinajero's lawyer. The records established that Ms. V. was examined, endocervical swabs were used to collect forensic specimens, and she was provided with pregnancy and sexually transmitted disease prevention.

Mr. Tinajero did not object to the testimony elicited by the State on hearsay grounds. In fact, he directed the witnesses' attention to the medical records himself when he wanted to establish facts helpful to the defense that the witnesses could not independently recall—for example, when he wanted to establish that Ms. V. did not appear to be upset and occasionally smiled. On appeal, however, he argues that his lawyer should have objected when the witnesses merely read from the medical records rather than testify from refreshed recollection.

Dr. Seymour and Nurse Littlefield both began their testimony with the medical records at hand and the State established early on that each might need to refer to the records to "refresh their recollection." The witnesses were repeatedly allowed and even

31

encouraged, by both lawyers, to refer to the medical records. Both witnesses acknowledged that they lacked an independent recollection, refreshed or otherwise. This was improper procedure under ER 612. That rule contemplates that a witness will review a document or other item that will refresh his or her independent recollection and will then be capable of testifying without further aids to memory.

Mr. Tinajero's lawyer's decision not to object—and to question the witnesses in the same manner himself—is readily explained as tactical. While Mr. Tinajero correctly observes that Ms. V.'s statements read from the medical records were double hearsay, it is clear from the two witnesses' testimony that the State would have been able to lay the foundation to admit the medical records as a recorded recollection under ER 803(a)(5) and, once admitted, Ms. V.'s statements made for the purpose of a medical diagnosis or treatment would be admissible as exceptions to the hearsay rule under ER 803(a)(4). *State v. Perez*, 137 Wn. App. 97, 106, 151 P.3d 249 (2007).

Mr. Tinajero argues, though, that Ms. V.'s statement to medical providers that she had been raped "was unnecessary for the medical care sought" and that "[i]t was sufficient that she had unprotected sex." Br. of Appellant at 46. The hearsay exception provided by ER 803(a)(4) is not limited to those statements made by a patient that are "necessary" for treatment, though, it includes

> [s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or

sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

ER 803(a)(4). A statement is reasonably pertinent when the declarant's motive is to promote treatment, and the medical professional reasonably relied on the statement for purposes of treatment. *State v. Williams*, 137 Wn. App. 736, 746, 154 P.3d 322 (2007). Courts presume a medical patient has a strong motive to be honest and accurate. *Perez*, 137 Wn. App. at 106.

Statements attributing fault are generally not relevant to diagnosis or treatment, but reporting that treatment is being sought for intercourse that was a rape is highly pertinent. Knowing that a rape occurred apprises medical personnel of the increased risk of injury from the sex, of a heightened uncertainty of the risk of sexually transmitted disease if the rapist was a stranger, of the need to discuss pregnancy prevention with the patient, and of the patient's possible need for counseling. *See State v. Woods*, 143 Wn.2d 561, 602, 23 P.3d 1046 (2001) (information needed to arrange for counseling where posttraumatic stress was foreseeable); *cf. State v. Moses*, 129 Wn. App. 718, 729, 119 P.3d 906 (2005) (identity of abuser in a domestic violence situation was pertinent and necessary to treatment).

Because the evidence would be admissible in another manner, an objection by Mr. Tinajero's lawyer would have been pointless. It might suggest to the jury that he was

trying to hide relevant, trustworthy evidence. The conduct of counsel can be fully explained as tactical.

### C. Sergeant Mike Russell

Sergeant Mike Russell testified to statements made to him by Ms. S. when he was the first patrol officer to respond to her report of the attempted rape. She had called from the orchard, which is where the sergeant encountered her. He testified that her demeanor, when he arrived, was that of someone who

> [had] been through a very recent, very difficult incident. She was visibly upset, shaking, crying with tears, very, very upset, not in an angry way, but in a very, very scared, even a terrified way.

RP at 964.

Mr. Tinajero asserts that "[Ms. S.] is not a party and no hearsay exception qualifies her statements as evidence." Br. of Appellant at 47. He elects not to address the apparent potential application of the exception for excited utterances provided by ER 803(a)(2).

A statement is not excluded by the hearsay rule if it "relat[es] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." ER 803(a)(2). The proponent of the exception must satisfy three requirements to qualify as an excited utterance. "First, a startling event or condition must have occurred. Second, the statement must have been made while the declarant was under the stress or excitement caused by the startling event or condition. Third, the

34

statement must relate to the startling event or condition." *Woods*, 143 Wn.2d at 597

(citing *State v. Chapin*, 118 Wn.2d 681, 686, 826 P.2d 194 (1992)); *State v. Pavlik*, 165

Wn. App. 645, 654, 268 P.3d 986 (2011), *review denied*, 174 Wn.2d 1009 (2012). In

determining whether the declarant made the statement while still under the influence of

the event, courts look to the amount of time that passed between the startling event and

the utterance, the declarant's emotional state at the time of the utterance, and "any other

factors that indicate whether the witness had an opportunity to reflect on the event and

fabricate a story about it." *State v. Briscoeray*, 95 Wn. App. 167, 174, 974 P.2d 912

(1999).

The State established a foundation for admitting Ms. S.'s statements to Sergeant

Russell as excited utterances. Mr. Tinajero fails to address that exception to the hearsay

rule in any fashion. We have no reason to believe that his trial lawyer's objection to the

sergeant's testimony would have been sustained.

## VI. Deadly Weapon Enhancement

Mr. Tinajero next assigns error to the court's increasing his sentence based on the

jury's finding that Mr. Tinajero was armed with a deadly weapon, arguing that the

evidence was insufficient to support the finding.

Evidence is sufficient to support a conviction if, after viewing the evidence in the

light most favorable to the State, any rational trier of fact could have found guilt beyond a

reasonable doubt. *State v. Kintz*, 169 Wn.2d 537, 551, 238 P.3d 470 (2010). A defendant

challenging the sufficiency of the evidence in a criminal case admits the truth of the

State's evidence and all reasonable inferences that can be drawn from it. *Id.* (quoting

*State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)).

A knife may qualify as a deadly weapon in two ways. It is a deadly weapon as a

matter of law if it has a blade longer than 3 inches. Former RCW 9.94A.602 (1983),

*recodified as* RCW 9.94A.825; *State v. Zumwalt*, 79 Wn. App. 124, 129, 901 P.2d 319

(1995), *overruled in part on other grounds by State v. Bisson*, 156 Wn.2d 507, 130 P.3d

820 (2006). Alternatively, the State can prove that it was a deadly weapon by presenting

evidence that it "has the capacity to inflict death and from the manner in which it is used,

is likely to produce or may easily or readily produce death." Former RCW 9.94A.602;

*Zumwalt*, 79 Wn. App. at 129-30; *State v. Peterson*, 138 Wn. App. 477, 482, 157 P.3d

446 (2007). "Relevant to this determination are the defendant's intent and present ability,

the degree of force used, the part of the body to which the weapon was applied and the

injuries inflicted." *Zumwalt*, 79 Wn. App. at 130. The jury was provided with this

definition.

Ms. V. testified that when Mr. Tinajero pulled his knife on her, he said, "you're

not going to leave, you're going to do what I tell you to do now" and she was "very

afraid." RP at 654. As he forced her at knifepoint into the interior of the orchard, she

begged him to let her go, telling him she had two daughters, to which he responded, "if

you don't do what I'm telling you to, then you're never going to see your daughters

36

again." *Id.* at 655. She testified that as he was raping her, he held the knife to her throat. She received minor cuts from the knife, on her arms.

The evidence supports a finding that the way in which Mr. Tinajero used the knife rendered it a deadly weapon. In using it to threaten her, he treated it as life threatening, telling her that if she did not do as he said, she would not see her daughters again. She perceived it as life threatening. His threats are evidence of his intent and ability. A jury could reasonably find that even a small knife held to Ms. V.'s throat would have the capacity to inflict death when used in this manner. *State v. Cook*, 69 Wn. App. 412, 418, 848 P.2d 1325 (1993). Sufficient evidence supports the jury's verdict.

## VII. Reliance on *Alford* Plea as a Conviction

Finally, Mr. Tinajero assigns error to the court's reliance on an *Alford* plea as a predicate offense in sentencing him to life in prison as a persistent offender. He argues that an *Alford* plea does not qualify as a conviction.

The prosecution bears the burden of proving a defendant's prior conviction. *State v. Saenz*, 175 Wn.2d 167, 172, 283 P.3d 1094 (2012). We review a trial court's determination of a defendant's persistent offender status de novo. *Id.*

Where a defendant qualifies as a "persistent offender" the sentencing court must impose a life sentence without possibility of parole. RCW 9.94A.570. The "two strikes" definition of a "persistent offender" includes a defendant who "(a)(i) Has been convicted in this state of any felony considered a most serious offense; and . . . (b)(i) Has been

37

convicted of . . . (B) any of the following offenses with a finding of sexual motivation: . . . burglary in the first degree." Former RCW 9.94A.030(33) (2006). The trial court sentenced Mr. Tinajero to life imprisonment under the "two strikes" definition based upon his conviction of the first degree rape of Ms. V., which qualifies as a most serious offense under former RCW 9.94A.030(29)(a), and his *Alford* plea in 1994 to first degree burglary with sexual motivation.

In an *Alford* plea, the defendant concedes that the evidence against him or her is strong and most likely would result in a conviction but still maintains innocence. *In re Pers. Restraint of Spencer*, 152 Wn. App. 698, 700 n.1, 218 P.3d 924 (2009) (citing *Alford*, 400 U.S. at 37). The court must find an independent factual basis for the guilty plea, which substitutes for an admission of guilt. *State v. D.T.M.*, 78 Wn. App. 216, 220, 896 P.2d 108 (1995). In light of that independent fact basis, a judgment entered upon an *Alford* plea is conclusive proof of guilt of the offense charged. *In re Disciplinary Proceeding Against McLendon*, 120 Wn.2d 761, 771, 845 P.2d 1006 (1993) (quoting *Florida Bar v. Cohen*, 583 So. 2d 313, 314 (Fla. 1991)).

"Conviction" is defined by the Sentencing Reform Act of 1981, chapter 9.94A RCW, to mean "an adjudication of guilt pursuant to Titles 10 or 13 RCW and includes a verdict of guilty, a finding of guilty, and acceptance of a plea of guilty." Former RCW 9.94A.030(12). Mr. Tinajero was adjudicated guilty of the 1994 predicate crime by virtue of the finding of guilt following entry of his *Alford* plea. The State was only

required to prove the fact of the conviction at the sentencing hearing, not the facts underlying the conviction. The trial court did not err in sentencing Mr. Tinajero as a persistent offender.

Affirmed.

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Korsmo, C.J.

Kulik, J.