# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | | |
|---|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70318-8-I | |
| Respondent, | ) | | |
| | ) | DIVISION ONE | |
| v. | ) | | |
| | ) | | |
| NANCY LYNN TOMLIN, | ) | UNPUBLISHED OPINION | |
| | ) | | |
| Appellant. | ) | FILED: March 2, 2015 | |
| | ) | | |

BECKER, J. — Nancy Tomlin appeals her conviction following a bench trial for rape of a child in the first degree. She contends that the trial court erred in permitting an assistant attorney general to appear and address the court about the current status of a child dependency proceeding. But the status of the dependency was directly relevant to the trial court's resolution of two pending defense motions. And because defense counsel's failure to object to the appearance was part of a legitimate strategy to investigate a potential defense witness, Tomlin's claim of ineffective assistance fails. We also conclude that the evidence was sufficient to support Tomlin's conviction and that the trial court properly entered written CrR 3.5 and CrR 3.6 findings of fact and conclusions of law. Tomlin's statement of additional grounds for review raises no meritorious issues. We affirm.

On December 8, 2010, the State charged Nancy Tomlin with one count of rape of a child in the first degree. The first trial ended in a hung jury. Tomlin waived her right to a jury trial, and the case proceeded to a bench trial in March 2013.

At trial, Trudy Sherman testified that in 2010 she lived in a Redmond apartment complex with her five-year-old son NS. Sherman was acquainted with Nancy Tomlin, who lived in a different building of the same complex with her four-year-old son EJ. NS and EJ occasionally played together. Sherman thought Tomlin was "a pretty decent person."

On November 24, 2010, the day before Thanksgiving, Tomlin asked Sherman if NS could come over to her apartment during the afternoon to play with EJ. Sherman, who was planning to precook her turkey for the following day, agreed, and NS went over to Tomlin's apartment.

Sometime later, Sherman thought she heard the "most heart-wrenching screams" and believed she recognized NS's voice repeatedly screaming "mom." When she was unable to contact Tomlin by phone, Sherman walked over to Tomlin's apartment and knocked on the door.

Sherman asked Tomlin if everything was okay. Tomlin said yes and invited Sherman in for a tour of the apartment. Sherman thought that Tomlin was talking unusually fast about various things. Sherman looked in on NS, who was coloring with EJ in EJ's room. NS said, "I'm okay, mom." Sherman felt a bit uneasy, but she returned to her apartment. She acknowledged there was no

physical way that she could have heard NS yelling in Tomlin's apartment. She insisted, however, that "I absolutely heard my son . . . I cannot explain it."

Shortly after returning to her apartment, Sherman called Tomlin and said that NS needed to come home. Tomlin returned NS a short time later. She repeatedly told Sherman that she had been "wrestling" with the children and that they "were having fun." Sherman did not notice anything unusual in NS's behavior that evening.

Sherman and NS spent Thanksgiving and the following night at the home of Sherman's ex-husband. At some point, Sherman planned to go out on Friday and called Tomlin to see if she could babysit NS. Tomlin agreed, but when Sherman told NS, he said he did not want to go. Sherman then called Tomlin and cancelled the appointment.

On Friday evening, NS became restless and would not settle down or go to bed. Around midnight, Sherman was ready to spank NS for his behavior but then decided to lie in bed with him. Sherman hugged NS until he settled down. After about 15 minutes, NS said that "something happened over at Nancy's."

Sherman asked what happened, and NS said Tomlin "pulled his pants down, put his penis in her mouth and sucked his penis." Sherman asked whether Tomlin's mouth was wet or dry, and NS said "wet." Sherman then asked what happened to his penis, and NS replied, "it got hard." NS said that he had asked Tomlin to stop three times and that when she was done, she pulled his

head up and told him not to tell anyone. Sherman asked NS why he had not said anything earlier, and NS replied that he did not know.

Sherman was angry and planned to call the police. But her ex-husband persuaded her to wait and ask NS about the incident one more time to see if he was lying. When NS repeated the allegations the following morning, November 27, Sherman took him home and called the police.

Redmond Police Officer Kate McGinnis responded to Sherman's call. Shortly after McGinnis entered Sherman's apartment, NS looked her in the eyes and said, "She sucked my penis, Nancy did."

Carolyn Webster, a child interview specialist, interviewed NS on December 1, 2010. NS told Webster that Tomlin had wrestled with him, pulled his pants down, and sucked on his "private." EJ was in the room and watched. Tomlin's mouth "felt wet" and made a "clicking noise." Nathan said that when Tomlin was done, his mother picked him up and brought him home.

On December 3, 2010, Detective AnnMarie Fein and Officer Nate Sanger went to Tomlin's apartment to talk about the allegations. When Tomlin opened the door, Fein told her that they wanted to talk to her and asked to come inside. Tomlin indicated that she preferred to speak with the officers outside. Fein informed Tomlin that there had been an allegation that NS's pants had been down during his recent visit and asked whether he had problems going to the bathroom. Tomlin said no and asked why "somebody would accuse her of something sexual." Fein then told Tomlin about the allegation that she had

sucked on NS's penis. Tomlin said the only contact she had with the boys was wrestling, which she described as "picking up the boys, throwing, trolling them around and throwing them on the bed."

Fein told Tomlin that she wanted to hear her side of the story, and Tomlin eventually agreed to a recorded interview inside the apartment. Before letting the officers in, Tomlin said that her boyfriend was inside sleeping, but they could talk at the kitchen table.

During the interview, Tomlin said that the only contact she had with NS during the visit was some "wrestling," during which she would twirl the boys around and then throw them on the bed. Tomlin claimed that when Sherman showed up unannounced, NS told Sherman that he did not want to go home yet and Sherman then left. A short time later, Tomlin walked NS home and everything seemed fine. Tomlin claimed that Sherman would have to be "sick" or "evil" to encourage NS to make up such an outrageous story.

At the conclusion of the interview, Fein arrested Tomlin. When Tomlin asked what would happen to her son, Fein suggested that Tomlin's boyfriend could care for EJ. Tomlin admitted that no one else was in the apartment. Because Tomlin could not care for EJ following her arrest, the State commenced a dependency proceeding involving EJ.

NS, who was eight at the time of trial, testified that he enjoyed playing with EJ because he had "really cool toys." NS recalled that once when he was playing with EJ in EJ's room, Tomlin came in, grabbed the boys' hands, and

started spinning them around. When she was done spinning NS around, she put him on the bed, pulled his pants and underwear down, and "then she bent down and got on her knees and put her mouth on my private." He said it "felt weird" and "kind of wet." NS yelled at Tomlin to stop and tried to push her way. After Tomlin stopped, she told him not to tell anyone. NS said that he then ran home by himself.

Tomlin testified that she became acquainted with Sherman while living in the same apartment complex. Sherman's daughter would occasionally babysit EJ.

Tomlin met NS for the first time when Sherman brought him by and asked her to babysit. NS and EJ occasionally played together at school. Tomlin believed that NS had been at her apartment a total of three or four times. On at least one occasion, Tomlin asked Sherman to babysit EJ.

On November 24, 2010, Tomlin was planning to prepare much of the food for her Thanksgiving dinner. At some point, Tomlin spoke with Sherman by telephone. The two had some discussion about NS and EJ playing together, but Tomlin could not recall that they reached any agreement as to the arrangements. In the midafternoon, just as she was preparing to leave for the grocery store, Sherman appeared at her door with NS. Tomlin was "shocked" because she had not arranged with Sherman where or when the boys would play together.

At Sherman's insistence, Tomlin then took NS to the store with her. After returning from the store, Tomlin told the boys to play in EJ's room and continued

with her cooking. At some point, Tomlin heard a knock and opened the door.
Sherman was standing outside and said she had heard NS screaming. Tomlin
gestured to Sherman to come in and then took her to EJ's room. NS told
Sherman that he did not want to come home.

Sherman then inspected the rest of the apartment before returning to the
kitchen, where she commented about the amount of food that Tomlin was
preparing. Tomlin asked Sherman if she wanted to the try the dressing.
Sherman said that she did, but before Tomlin could give her a sample, Sherman
"stuck her fingers right in my dressing and put it in her mouth." A short time later,
Sherman left.

After preparing some more food, Tomlin looked in on the boys. EJ
grabbed her and insisted that she "twirl" him. Tomlin twirled him around and
tossed him on the bed. NS watched and asked Tomlin to twirl him. Tomlin then
grabbed NS by the hands, swung him around, and tossed him onto EJ's bed. A
short time later, Sherman called and asked Tomlin to return NS.

Tomlin returned NS to Sherman's apartment. She told Sherman about
how she had swung the boys around and tossed them onto the bed. After
chatting for a few minutes, Tomlin returned to her apartment.

Tomlin acknowledged that she may have mistakenly called the activity
with EJ and NS "wrestling," but that she considered it "twirling." She admitted
that she had told Fein that she did not go anywhere on the day of the alleged
crime. She explained that she had been so upset during the interview that "I left

a lot of things out that I would have said." She also acknowledged that certain details of her testimony in the first trial might not be accurate. Tomlin denied having sexual contact with NS and believed that Sherman had encouraged NS to make up the allegations.

Denise Roderer, a forensic scientist with the Washington State Patrol Crime Laboratory, tested several pairs of NS's underwear for DNA (deoxyribonucleic acid). Roderer excluded Tomlin from the DNA typing profiles that she prepared.

The trial court found Tomlin guilty as charged. The court noted that there were some inconsistencies in NS's accounts of the offense but found that he was generally "very straightforward and articulate in his testimony" about the essential details of the offense. The court observed no hatred, bias, or prejudice in Sherman's and NS's accounts and found both witnesses credible. The court found Tomlin was not credible, noting she had been "remarkably inconsistent" in her accounts.

The court imposed an indeterminate sentence with a standard range minimum term of 93 months and a maximum term of life imprisonment.

Appearance of the Assistant Attorney General

Tomlin contends that the trial court erred in permitting Mary Ann Comiskey, the assistant attorney general representing the Department of Social and Health Services (DSHS) in EJ's dependency proceeding, to appear in the criminal proceeding and provide information about EJ's current competence to

testify. She argues that Comiskey's comments suggesting that she was an unfit mother adversely affected her credibility. She further asserts that defense counsel's failure to object to Comiskey's "inexplicable presence" was constitutionally deficient.

But Comiskey's presence was not inexplicable. DSHS had been EJ's legal custodian for more than two years as a result of the dependency proceeding. On March 25, 2013, the day that the parties appeared for trial, defense counsel Kevin McCabe filed motions in limine seeking orders "addressed to DSHS, by and through attorney Ms. Comiskey," requiring DSHS to produce EJ for a defense psychological evaluation and for a defense interview to assess his competence to testify, and to produce all recent dependency records relevant to EJ's competence. Neither party had attempted to call EJ as a witness during the first trial.

McCabe informed the court that he had been discussing the matter with Comiskey for more than a month but that he had subpoenaed EJ and the dependency records only three days earlier. McCabe knew that DSHS opposed the defense motions but acknowledged that Comiskey had not yet had sufficient time to respond to the subpoenas. He explained that the lack of advance notice occurred in part because the date for Tomlin's retrial had been accelerated when the deputy prosecutor became available earlier than anticipated. McCabe also noted that consideration of his motions might require a trial continuance.

The trial court then explored with the parties how to proceed with the defense motions and reviewed in detail which records it should consider when making the decision. The court directed that all parties receive copies of any materials that it considered in making the decision.

During the course of the hearing, Comiskey informed the court of the general status of the dependency and explained that DSHS generally opposed EJ's participation in a defense evaluation or testimony at trial because of the negative effect it might have on his current condition. Comiskey suggested that the court could consider a number of recent evaluations and declarations that were already part of the record in the dependency proceeding. In response to the trial court's questions, Comiskey stated that "there are no allegations that the mother has sexually abused [E.J.]" but volunteered that there were "other concerns about the child." Comiskey said that there were currently no plans for reunification and that she believed that "my client's position is to move toward termination."

At the time of the hearing, defense counsel had directed subpoenas and motions in limine to the AAG representing DSHS and had conducted prior discussions with her. As EJ's custodian, DSHS would necessarily be involved in any arrangements for a defense interview or EJ's appearance as a trial witness. Although the better practice would be to document on the record the basis for a nonparty's appearance, the trial court did not err or abuse its discretion in permitting Comiskey to address the defense's motions.

Moreover, given his awareness of DSHS's opposition to the defense motions and subpoenas, the short notice of the motions, and the possible need to seek a trial continuance, defense counsel was clearly attempting to facilitate a prompt decision on the motions. The record strongly suggests that Comiskey appeared in court with the consent—or at the request—of both parties. Allowing Comiskey to address the court without first requiring DSHS to file a formal written objection to the motions and subpoenas enabled the trial court to rule on the motions without any unnecessary delay. Under the circumstances, defense counsel's failure to object to Comiskey's appearance was a reasonable trial strategy that will not support a claim of ineffective assistance. See State v. Grier, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011) (legitimate trial strategy cannot form the basis for a claim of ineffective assistance of counsel).

We agree with Tomlin, however, that some of the information that the trial court elicited from Comiskey was inappropriate and irrelevant. Information suggesting Tomlin's unfitness as a mother, either in connection with the ongoing dependency or as a basis for terminating her parental rights, was not relevant to the issue of EJ's competence to testify.

But Tomlin waived her right to a jury trial. Absent evidence to the contrary, we presume the judge in a bench trial did not consider improper matters or inadmissible evidence in rendering a verdict. State v. Gower, 179 Wn.2d 851, 855, 321 P.3d 1178 (2014). Nothing in the record suggests that the trial court considered Comiskey's comments or any inappropriate information in assessing

Tomlin's credibility in the criminal proceeding. Moreover, after interviewing EJ, defense counsel withdrew him as a potential witness. On appeal, Tomlin does not challenge defense counsel's decision not to call EJ as a witness or the trial court's denial of a defense psychological evaluation. Because she fails to demonstrate any resulting prejudice, defense counsel's failure to object to some of Comiskey's comments cannot constitute ineffective assistance of counsel. See State v. McFarland, 127 Wn.2d 322, 337-38, 899 P.2d 1251 (1995) (failure to demonstrate either deficient performance or prejudice defeats a claim of ineffective assistance of counsel).

## CrR 3.5 and CrR 3.6 Findings of Fact and Conclusions of Law

Tomlin contends that the trial court's failure to enter written findings of fact and conclusions of law following the CrR 3.5 and CrR 3.6 hearings prevents her from challenging these decisions on appeal. But the record shows that the trial court entered written CrR 3.5 and CrR 3.6 findings and conclusions more than two months before Tomlin filed her opening brief. Tomlin's contentions are therefore without merit.

## Sufficiency of the Evidence

Tomlin contends that the evidence was insufficient to support her conviction. In particular, she alleges that the evidence fails to support the trial court's findings of fact 9, 10, 11, 12, 17, 18, 19, 20, and 21.

When a defendant challenges the sufficiency of the evidence following a bench trial, an appellate court reviews whether substantial evidence supports the

findings of fact and, if so, whether the findings support the conclusions of law. State v. Stevenson, 128 Wn. App. 179, 193, 114 P.3d 699 (2005). Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the matter asserted. State v. Homan, 181 Wn.2d 102, 106, 330 P.3d 182 (2014). A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences from that evidence. State v. Kintz, 169 Wn.2d 537, 551, 238 P.3d 470 (2010).

Here, the challenged findings set forth the trial court's reasoning in assessing the conflicting evidence and testimony. Among other things, the trial court acknowledged that there were "some inconsistencies in the evidence." The court noted that NS may have given conflicting accounts of Tomlin's position during the offense and that he may have used the word "penis" when describing the incident to Officer McGinnis at a time when he did not know the meaning of the word. Tomlin also points to NS's testimony that he ran home immediately after the incident and told his mother, a detail that conflicted with both Sherman's and Tomlin's accounts. The court also explained that it did not detect any hatred or prejudice in NS or Sherman that could serve as a motive for false allegations.

Tomlin suggests that NS's and Sherman's accounts of the offense were too inconsistent to permit a rational trier of fact to find her guilty. She argues that NS "said many conflicting things about the event to many people . . . All of these statements cannot be true." But as the trial court indicated, NS's accounts of the actual offense remained relatively consistent. Cf. State v. Alexander, 64 Wn.

App. 147, 822 P.2d 1250 (1992) (victim's extreme contradictions and inconsistencies about chronology of abuse and whether it occurred at all, combined with other errors, denied the defendant a fair trial).

The trial court here was able to observe the trial testimony and the demeanor of all the witnesses. The court also considered the trial testimony in light of the video recording of NS's interview with the child interview specialist shortly after the incident, the audio recording of Tomlin's interview with the police, and the parties' testimony during the first trial. After considering all of the evidence, the court found the testimony of NS and Sherman to be straightforward and credible as to the essential details of the offense and the testimony of Tomlin to be inconsistent and not credible. This was a credibility determination that this court cannot review. See State v. Camarillo, 115 Wn.2d 60, 794 P.2d 850 (1990) (appellate court defers to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence).

Viewed in the light most favorable to the State, the evidence was sufficient to permit a rational trier of fact to have found all of the elements of rape of a child in the first degree. See RCW 9A.44.073.

Statement of Additional Grounds for Review

In her Statement of Additional Grounds for Review, Tomlin contends that the trial judge had a conflict of interest because his wife is an attorney in the same public defender organization as Tomlin's attorney in the dependency proceeding. She asserts that because both the public defender organization and

the judge's wife had "*years* of animosity towards me and my case," the trial judge was biased against her and should have recused himself.

As evidence of the judge's bias, Tomlin relies primarily on the trial court's denial of her motion to permit a defense psychological expert to interview EJ to evaluate his competency to testify. She claims that the testimony of her son, who was present at the time of the alleged crime, would have established her innocence.

The record shows that the trial judge informed the parties of his wife's position in the defender organization and stated that she had never worked in the dependency unit. The judge offered to recuse himself on that basis upon request, but neither party objected.

Tomlin has not identified any evidence to support her allegations of personal animosity by the trial judge's wife. Nor is there anything in the record supporting her claims of what EJ would have said if called to testify. After interviewing EJ, defense counsel concluded that he was competent but had no independent memory of the relevant events. Counsel therefore did not call EJ as a witness.

Because Tomlin's allegations regarding the trial judge rest primarily on matters that are outside the record on review, we will not consider them on direct appeal. See State v. McFarland, 127 Wn.2d at 337-38. The mere existence of adverse rulings does not support an inference that the trial court was biased or prejudiced. See Rhinehart v. Seattle Times Co., 51 Wn. App. 561, 579-80, 754

P.2d 1243, review denied, 111 Wn.2d 1025 (1988), cert. denied, 490 U.S. 1015 (1989).

Tomlin also alleges prosecutorial misconduct and ineffective assistance of counsel. She claims that the deputy prosecutor improperly informed the court about plea negotiations and made fun of her, used inappropriate language, and threatened her in the courtroom. She alleges that defense counsel was constitutionally deficient because he failed to take account of the effect that her serious ear infection and learning disability had on her ability to testify and participate at trial, failed to object to the assistant attorney general's comments to the court, failed to arrange a psychological evaluation for her, and failed to emphasize exculpatory DNA evidence. She further alleges that defense counsel was not qualified to interview her son and failed to question her on the stand in a manner that would have explained her "accidental distraught misstatements."

Several of Tomlin's allegations of prosecutorial misconduct and ineffective assistance are simply too conclusory to address. See RAP 10.10(c) (appellate court will decline to consider issues in statement of additional grounds for review if they do not "inform the court of the nature and occurrence of alleged errors"). The remaining allegations are based on matters outside the record and cannot be considered on appeal.

Finally, Tomlin challenges the trial court's determination following the CrR 3.6 hearing that she voluntarily consented to the officers' entry into her apartment. She argues that the shock of the untrue allegations, coupled with her

No. 70318-8-I/17

learning disability, caused her to feel "coerced" and rendered her consent involuntary. But Tomlin testified at the CrR 3.6 hearing. The trial court's assessment of her attempts to explain the omissions, inaccuracies, and inconsistencies in some of her statements involves issues of credibility that this court cannot review on appeal. State v. Fiser, 99 Wn. App. 714, 719, 995 P.2d 107, review denied, 141 Wn.2d 1023 (2000).

Affirmed.

Becker, J.

WE CONCUR:

-17-