# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, ) | DIVISION ONE |
| Respondent, ) | |
| ) | No. 73364-8-I |
| v. ) | |
| ) | UNPUBLISHED OPINION |
| BRIAN ALLEN SCOTT, ) | |
| ) | |
| Appellant. ) | FILED: April 18, 2016 |
| ) | |

DWYER, J. — Brian Scott appeals from his conviction of violation of the

Uniform Controlled Substances Act—possession with the intent to deliver

cocaine.[1] He contends that the State failed to present sufficient evidence of an

essential element of the crime—intent to deliver—and, thus, insufficient evidence

supports his conviction. Because the record contains sufficient evidence of

Scott's intent, we affirm.

I

On December 9, 2014, Detective Terry Bailey, Detective Jeffrey Sharp,

and Officer Wes Collier—all of the Seattle Police Department—were conducting

a "see-pop operation." "See-pop" is a term that "refers to . . . an operation where

you are just . . . conduct[ing] surveillance and watch[ing] somebody selling

---

[1] RCW 69.50.401(1), (2)(a).

narcotics and then arrest[ing] them." When conducting such operations, officers perform either one of two functions: engaging in observation or effectuating an arrest. The observing officers dress in plain clothes while the arresting officers dress in uniform. On this particular day, Collier was the observing officer while Bailey and Sharp were the arresting officers. Collier was utilizing a concealed earpiece that was connected to a radio, which allowed him to communicate with Bailey and Sharp.

At approximately 3:00 in the afternoon, Collier was on foot "looking for narcotics activity" in the "Pike/Pine [corridor]" in downtown Seattle. Specifically, he was "looking for any hand-to-hand transactions that could possibly be related to narcotics."

On the southwest corner of Second and Pine streets, Collier saw a man, who was later identified as Scott. Scott caught Collier's attention because Collier was "familiar with the people who [he] believe[d] [were] addicted to crack cocaine. [He] s[aw] these guys in the area almost surrounding [Scott]." Collier followed Scott and two other persons as they started walking westbound. Collier estimated that he was "probably within an arm's length of Mr. Scott and the two subjects."

From this vantage point, Collier saw Scott remove "a small plastic baggie" from his right jacket pocket. The bag contained "small white rocks, which [Collier] believed to be crack cocaine." Collier then observed Scott engage in two transactions with "[t]wo different people," which lasted "[p]robably less than five seconds." During these transactions, Collier saw Scott hand "loose rocks" to

-2-

each of the two people in exchange for money. The two people then walked eastbound while Scott and Collier walked westbound.

While following Scott, Collier gave "the arrest team information such as [Scott's] description, direction of travel and what [Collier had] seen." Collier described Scott as a light-skinned black male with short curly hair who was wearing a dark jacket with the hood down, blue jeans, and light sneakers. Collier noticed a distinctive Seahawks tattoo on Scott's neck, but did not relay this information to the arrest team.

Bailey and Sharp, who were riding together in a "subdued vehicle[ ],"[2] were notified via radio of the need to effectuate Scott's arrest. While driving to Collier's location, Bailey and Sharp continued to receive updated information from Collier regarding Scott's movements. By the time that Bailey and Sharp arrived at the scene, Collier and Scott had walked to the 1500 block of First Avenue.

Upon arriving at that site, Bailey saw a man matching Scott's description. Collier stopped following Scott but continued observing, now from across the street. Bailey started following Scott, who was now walking southbound. With Scott walking ahead of him, Bailey loudly stated, "Seattle Police." Scott continued walking southbound.

---

[2] Bailey described the vehicle:
[W]e call them subdued cars. They are patrol cars but they don't have the black— they have a retroreflective marker on the side so it's not easily visible and they don't have a light bar on top. They also don't have a cage in the back so it's just open seating.

As Scott passed a series of trash cans at the northeast corner of First and Pike streets, Bailey observed that "[i]t looked like [Scott] put something in between the bucket carrier. The green grate that holds the trash can bucket and the trash -- and the actual trash bucket." Bailey testified that his view of Scott was not obstructed. At trial, Bailey was asked if other people were surrounding the trash can and if it looked like other people were using the trash can. Bailey responded "no" to both questions. In addition, Collier testified that he "could see [Scott] go into his right jacket pocket . . . and then put the baggie on the rim of the metal container."[3]

Following a directive from Bailey, Sharp "walked over to a trash can where [he] located some narcotics." The contents of the bag "appeared to [Sharp] to be cocaine."[4] He then seized the bag, its contents included, and later took it back to the station for it to be placed into evidence.

Bailey then arrested Scott. He later performed a search. During this search, Bailey found many items in Scott's possession including $78, two cell phones, an electronic device, and an identification card. The white substance in the baggie was sent to a crime lab where it tested positive for cocaine. The cocaine weighed 1.1 grams.

Scott was charged with one count of violation of the Uniform Controlled Substances Act, with the intent to deliver. Following a jury trial, Scott was convicted as charged. Scott's posttrial motion to arrest the judgment or, in the

---

[3] The record indicates that Scott's right front pocket is the same pocket from which Collier had seen Scott retrieve the "small white rocks" during the earlier transactions with the two people.
[4] At trial, Sharp testified that "I think it was rock cocaine."

alternative, to grant a new trial was denied. The trial court sentenced him to a 60-month term of imprisonment. He appeals.

II

Scott contends that insufficient evidence supports his conviction. This, he asserts, is because the State failed to present sufficient evidence that Scott had an intent to deliver the cocaine. We disagree.

The due process clause of the Fourteenth Amendment requires that the State prove every element of a crime beyond a reasonable doubt. Apprendi v. New Jersey, 530 U.S. 466, 476-77, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000); U.S. CONST. amend. XIV. "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319.

A claim of evidentiary insufficiency admits the truth of the State's evidence and all reasonable inferences that can be drawn from that evidence. State v. Kintz, 169 Wn.2d 537, 551, 238 P.3d 470 (2010). Circumstantial evidence and direct evidence can be equally reliable. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the jury on questions of conflicting testimony,

-5-

credibility of witnesses, and the persuasiveness of the evidence. State v. Killingsworth, 166 Wn. App. 283, 287, 269 P.3d 1064 (2012).

"[I]t is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance." RCW 69.50.401(1). To convict Scott of possession of a controlled substance with intent to deliver, the jury was required to find that each of the following elements of the crime was proved beyond a reasonable doubt:

> (1) That on or about [ ] December 9, 2014, the defendant possessed a controlled substance;
> (2) That the defendant possessed the substance with the intent to deliver a controlled substance; and
> (3) That the acts occurred in the State of Washington.

Jury Instruction 8. The jury was instructed that, "[c]ocaine is a controlled substance," Jury Instruction 12, that "[p]ossession means having a substance in one's custody or control," Jury Instruction 10, and that "[d]eliver or delivery means the actual transfer of a controlled substance from one person to another." Jury Instruction 11.

Thus, in order to convict Scott as charged, the State had to prove that he acted with the specific intent to deliver the cocaine. "Specific intent to deliver a controlled substance is a statutory element of the crime of possession with intent to deliver." State v. Hernandez, 95 Wn. App. 480, 484, 976 P.2d 165 (1999) (citing Former RCW 69.50.401(a)(1) (1998)). "Intent is assessed objectively, rather than subjectively." Hernandez, 95 Wn. App. at 484 (citing State v. Rodriguez, 61 Wn. App. 812, 816, 812 P.2d 868 (1991)). "A person acts with intent or intentionally when he or she acts with the objective or purpose to

-6-

accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a); State v. Atsbeha, 142 Wn.2d 904, 918, 16 P.3d 626 (2001). Specific intent cannot be presumed, but it can be inferred as a logical probability from all of the facts and circumstances. State v. Davis, 79 Wn. App. 591, 594, 904 P.2d 306 (1995).

Intent to deliver cannot be inferred from mere possession of a controlled substance. State v. Harris, 14 Wn. App. 414, 418, 542 P.2d 122 (1975). However, intent to deliver can be inferred when all of the facts and circumstances indicate that there is possession of a controlled substance plus "at least one additional factor." State v. Brown, 68 Wn. App. 480, 484, 843 P.2d 1098 (1993).

The State alleged that Scott had possessed the cocaine found on the trash can. Laboratory analysis established that the substance was, in fact, cocaine. Both Collier and Bailey testified to seeing Scott handle the cocaine and place it on the trash can.

The State further alleged that Scott's intent to distribute the cocaine was proved by Collier's testimony that he, in fact, witnessed Scott distribute cocaine. Further, that Scott was, indeed, the person observed by Collier distributing cocaine was established by: (1) Collier's testimony that he observed Scott distribute the cocaine; (2) Collier's testimony that he watched Scott's movements until after Bailey began following Scott; (3) Collier's radio-transmitted description of Scott's appearance and clothing which led Bailey to focus on Scott; (4) the testimony of both Collier and Bailey that they each saw Scott put a baggie on the trash can (indicating that they were both watching the same person); and (5) Collier's in-court identification of Scott as being the person he saw distribute

cocaine, in part based on the Seahawks tattoo. Taking this evidence in the light most favorable to the State, the <u>Jackson</u> test is easily met.[5]

Based on the resolution of this issue, Scott's other claim of error need not be addressed.

Affirmed.

We concur:

---

[5] Scott challenges the jury's resolution of the factual issues presented at trial, asserting various inconsistencies or contradictions in the prosecution's case. This approach is not consistent with the <u>Jackson</u> mandate.